IMPERIAL GROUP (TEXAS), INC., et al., Appellants,

v.

Ira SCHOLNICK, et al., Appellees.

No. 12–85–0050–CV.

Court of Appeals of Texas, Tyler.

April 24, 1986.

Rehearing Denied May 22, 1986.

Lawrence E. Ackels, Jr., Ackels, Ackels & Ackels, Jerome H. Ferguson, III, Jack Pew, Jr., Dallas, for appellants.

Bill Kuhn, Baker, Smith & Mills, Dallas, for appellees.

COLLEY, Justice.

Appellants[1] Imperial brought suit against appellees[2] Scholnick to recover profits realized personally by Ira Scholnick, an officer and director of Imperial, from the purchase and sale of real estate allegedly in violation of fiduciary duties owed by Scholnick to Imperial, and seeking the imposition of a constructive trust on funds and properties standing in the name of Scholnick or others for his benefit. Imperial also sought exemplary damages, prejudgment interest and postjudgment interest.

The case was tried before a jury who generally answered the submitted issues favorably to Scholnick. The trial judge rendered judgment on the verdict that Imperial take nothing, and on Scholnick's counterclaim, without jury findings to support his action, awarded Scholnick $13,000 in back salary and adjudged certain loans made by Imperial to Scholnick as not constituting personal obligations of Scholnick. We affirm in part, reverse and render in part, and reverse and remand in part.

This case involves the three separate real estate transactions between Scholnick and third parties; and, Scholnick's counterclaim involving the terms of his employment with Imperial. Imperial presents twenty-one points of error, and groups its points for argument as to each transaction and the counterclaim. We shall discuss the points and the evidence relating thereto in the same manner.

The setting of this dispute is as follows: Imperial consists of a group of corporations of which there are five common shareholders known as the "core group" who make the corporate decisions for Imperial. Gerald A. Libling is the chief executive officer and president of the "Imperial Group of Companies."

Libling hired Ira Scholnick in April 1979. Scholnick's initial position was Vice President, Marketing, Research and Development, with a $50,000 annual salary and a potential annual bonus of up to $75,000. It was understood that Scholnick would "grow" into the position of Vice President, Residential Operations. Scholnick was initially based in Winnipeg, but moved to Calgary, Canada, in August 1980. He was responsible for all aspects of Imperial's business except construction of Imperial's multi-family apartment projects in Calgary. It was stipulated that at all times material to this suit Scholnick was Vice President and/or Director of Groveridge Imperial Enterprises; Groveridge Imperial Homes, Sun Ridge, Texas, Inc.; Groveridge Imperial Properties; and was an agent of Imperial Development, Canada, Limited in the Imperial Group of Texas, Inc.

In the fall of 1982, Ira Scholnick began commuting to Dallas twice a month. Scholnick testified that he was sent there to review the market and to locate land suit-

---

1. Imperial Group, Inc., a Texas corporation; Groveridge Imperial Properties, Ltd.; Groveridge Imperial Properties, Ltd. (Calgary); Imperial Development, Ltd. (Canada); and Imperial Group Corporation, a Delaware corporation, hereinafter referred to collectively as "Imperial," were plaintiffs below.

2. Ira Scholnick, individually; Ira Scholnick, d/b/a/ M-Jay Development, Inc., a Texas corporation; Sagebrush Association Joint Venture; and Rochelle Scholnick, wife of Ira Scholnick, hereinafter referred to collectively as "Scholnick," were defendants below. References to "Ira Scholnick" are to him individually.

able for apartment development. Libling testified that Scholnick was asked to review "the overall market and the overall opportunities and spend some time there and do an overall assessment of the market." Following the resignation in January 1983 of Imperial's only other Dallas representative, Sig Goodman, whose duties had included the purchase of raw land, Scholnick became the sole Imperial representative in the Dallas area real estate market.

Scholnick gave notice of his resignation to Imperial by letter dated February 13, 1984. Company policy provided that either party could terminate employment after ninety days' notice. While continuing to work with Imperial to effect what Scholnick termed "a smooth disengagement" he began preparations to move to Dallas. In a letter dated April 7, 1984, he again set out his reasons for leaving, and stated that he would "delay formalizing certain relationships" until Imperial could review a proposed partnership arrangement between it and himself. On April 12, 1984, Scholnick conveyed his Calgary residence to his wife. On April 26 and 27, Mrs. Scholnick removed personal records and "daytimer" diaries from his office at Calgary. During that same week Scholnick withdrew $151,-000 from his bank account. Scholnick was, in his words, "terminated" on or about April 27. He testified that Imperial filed a suit against him in Canada on that same day.

### HORSEFARM TRACT (points one-four)

On September 22, 1982, Scholnick entered into a contract for the purchase of a 10.0-acre tract, denominated in the record as the "Sun Ridge" tract. This tract was located for Imperial by the Charlie Adams Co., a Dallas real estate firm which contracted with its owners to purchase the same. Under the contract Imperial had a forty-five-day "free look" and a right to cancel the contract prior to November 7, 1982, and recover the $25,000 earnest money deposited by Imperial. By late October, Scholnick was unable to obtain financing for Imperial on the Sun Ridge tract. Rather than commit the $25,000, Libling instructed Scholnick to obtain an extension, and in the alternative, locate "back-up" tracts. Scholnick authorized the Charlie Adams firm to look for alternative tracts, and two tracts totaling eight acres located just east of the Sun Ridge tract, denominated "Horsefarm Tract" in this record, were identified as potential sites for Imperial. Scholnick thought the tracts were suitable for Imperial's purposes and instructed the Charlie Adams firm to begin negotiations for purchase on behalf of Imperial. Scholnick had informed Imperial about the possibility of obtaining these tracts and had even shown them to Libling in late October. On November 5, 1982, Scholnick informed Libling that he had not been able to successfully negotiate a purchase of the Horsefarm Tract, and Libling again instructed him to try for an extension on the Sun Ridge Tract.

Scholnick was able to get an extension until December 7, 1982, of the "free-look" period on the Sun Ridge Tract and never mentioned the Horsefarm tract to Libling again. The last word Libling had from Scholnick on that tract was that Scholnick was unable to procure a contract of sale thereon. On November 18, 1982, the Charlie Adams Company was successful in procuring a contract of purchase with the Horsefarm owners, taking contracts in the name of "Charlie Adams Company, Trustee and/or Assigns," as purchaser. The contracts called for a purchase price which was $250,000 less than the purchase price of the Sun Ridge Tract. Scholnick admitted that he knew before the December 7 expiration date of the extension of the contract on the Sun Ridge Tract that the Charlie Adams firm had the Horsefarm Tract under contract, and he also admitted that he never disclosed this information to Imperial.

On December 7, Imperial deposited an additional $25,000 on the Sun Ridge Tract for another extension. Scholnick still did not reveal the details of the Horsefarm contract to Imperial and when asked why, he testified that the Horsefarm Tract "was lesser acreage and not a good site," and

because there had been engineering studies and architectural drawings costing approximately $15,000 on the Sun Ridge site. He stated that "it was academic whether there was another piece of land out there."

Shortly after November 18, Scholnick told the Charlie Adams firm that Imperial had decided to close on the Sun Ridge contract, and therefore had decided not to purchase the Horsefarm property. At that time the Charlie Adams firm and Scholnick decided to undertake their own joint venture on the Horsefarm Tract.

On December 21, 1982, Scholnick formed his own corporation,[3] M-Jay Developments, Inc. On December 22, 1982, Charlie Adams, Trustee, assigned its rights as purchaser under the Horsefarm contract to M-Jay Developments, Inc. Scholnick did not disclose to Imperial either the formation of M-Jay Developments Corporation or his involvement in the Horsefarm purchase with Adams.

On March 30, 1983, M-Jay Developments, Inc. closed its purchase of the Horsefarm Tract, and immediately resold it to Houseman Properties, Inc. for a total profit of $221,956.51, Scholnick's personal share being $121,978.25. Houseman eventually constructed an apartment complex on the tract *in competition with Imperial's project* on the "Sun Ridge" tract.

In the interim, Scholnick had been arranging a permanent financing agreement for Imperial on the Sun Ridge project with the Richard Gill Company. An agreement was signed April 28, 1983, between Gill as limited partner and Sun Ridge (Texas), Inc. as general partner. This agreement prohibited Imperial from entering into a competing apartment project within a two-mile radius of Sun Ridge.

Scholnick testified that the Horsefarm Tract was "within the financial capability of Imperial" and within Imperial's "general strategy of acquisition." Two special issues were submitted to the jury concerning the Horsefarm Tract. The jury found that Scholnick did not disclose the material facts to Imperial before taking the Horsefarm opportunity for himself,[4] but found that Imperial, in their normal line of business, would not have acquired the tract at the time Scholnick acquired it.[5]

Imperial filed a motion for judgment n.o.v. contending that there was no evidence to support the answer to Special Issue No. 2 and that the answer is immaterial. On motion for new trial, Imperial asserted that the answer to Special Issue No. 2 was not supported by factually sufficient evidence and was against the overwhelming weight of the evidence.

In the first point of error Imperial contends that because the jury found that Scholnick did not disclose the material facts to Imperial before he acquired the Horsefarm Tract, as a matter of law Scholnick acquired the tracts in violation of his fiduciary duties to Imperial. In points two, three and four respectively, they argue that the trial court erred in refusing to disregard the jury's answer to Special Issue No. 2 because it is without support in the evidence, the finding is immaterial, and is so against the great weight and preponderance of the evidence as to be manifestly wrong and unjust. Scholnick counters with the argument that Imperial had rejected the Horsefarm tract before it became available and thus he had no obligation to Imperial regarding it.

 The key to Imperial's case is the duty owed by a fiduciary to his principal.

---

3. Scholnick owned 100% of the share of M-Jay Developments, Inc.

4. Special Issue No. 1 inquired: "As to the Horse-Farm (Houseman) Tract, do you find from a preponderance of the evidence that Ira Scholnick disclosed the material facts relating to such acquisition to Plaintiffs before he acquired an interest in it? ..." The jury's response was: "Did not disclose."

5. Special Issue No. 2 inquired: "As to the 'Horse Farm' (Houseman) tract, do you find from a preponderance of the evidence that Plaintiffs [sic], in their normal line of business, would not have acquired the tract at the time it was acquired by Defendant Ira Scholnick?" The jury's response was: "Plaintiffs would not have acquired."

Corporate officers and directors are fiduciaries as to the corporation, and as such are under an obligation not to usurp corporate opportunities to obtain personal gain. *International Bankers Life Ins. Co. v. Holloway*, 368 S.W.2d 567, 576–577 (Tex.1963). "The rule that requires an undivided and unselfish loyalty to the corporation demands that there shall be no conflict between duty and self-interest. The [methods] for the determination of honesty, good faith and loyal conduct are many and varied, and no hard and fast rule can be formulated. The standard of loyalty is measured by no fixed scale." *Guth v. Loft*, 23 Del. 255, 5 A.2d 503, 510 (1939). The so-called "corporate opportunity" rule is but a means, judicially designed, to test the conduct of the fiduciary respecting the requirements cast on him of "utmost good faith in his relations to the corporation he represents." *Id.* "The responsibility of the corporate fiduciary includes the dedication of his uncorrupted business judgment for the sole benefit of the corporation." *International Bankers Life Ins. Co. v. Holloway*, 368 S.W.2d at 577. In *Johnson v. Peckham*, 132 Tex. 148, 120 S.W.2d 786, 787 (1938), the Supreme Court, after finding a fiduciary relationship between partners, cited the following principle, "[E]ach is required to make full disclosure of all material facts within his knowledge in any way relating to the partnership affairs." The same principles of law apply to the fiduciary duties of corporate directors and officers as to partnerships. *Huffington v. Upchurch*, 532 S.W.2d 576, 579 (Tex.1976).

█ Scholnick's argument that Imperial rejected the opportunity to purchase the Horsefarm Tract is without support in the record. In fact, the last information Imperial received about the Horsefarm Tract was that Scholnick had been unable to secure a contract for purchase of the tracts. Scholnick did not reveal to Imperial that the Charlie Adams firm *was* able to acquire, and had in fact acquired, that tract. Scholnick learned of the availability of the Horsefarm Tract on November 18, and yet he allowed Imperial to commit another $25,000 for an additional extension of the contract on the Sun Ridge Project on December 7. Scholnick was Imperial's sole representative in the Dallas area and Imperial was entitled to rely on his application of his uncorrupted business judgment to their enterprises. Prompt and complete disclosure by Scholnick of all opportunities within Imperial's area of interest was crucial, expected and mandated by the law. Scholnick *admits* the Horsefarm Tract was within Imperial's scope of business. The jury found that Scholnick did not disclose all material facts to Imperial. As a matter of law, Scholnick breached his fiduciary duty of full disclosure to Imperial.

█ It is immaterial that the jury found that Imperial would not have acquired the Horsefarm Tract. If an opportunity is within the scope of a corporation's business, then the only acceptable method of determining whether a corporation would take advantage of the opportunity is by complete disclosure of the opportunity to it. The corporate opportunity doctrine requires total disclosure. The decision to accept or reject the opportunity to purchase the Horsefarm Tract was Imperial's alone, acting upon full and complete knowledge of the material facts surrounding the opportunity. To permit an after-the-fact determination as to whether Imperial would have purchased the Horsefarm Tracts under the facts before us would abrogate the full disclosure rule. We conclude that Scholnick's failure to disclose the opportunity presented by Horsefarm renders the finding of the jury that Imperial "would not have acquired the tract" immaterial. Imperial's points one and three are sustained. We need not address points two and four, but if we did, we would sustain those points as well from our review of the evidence under the standards of review enunciated in *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex.1965); and *In re King's Estate*, 150 Tex. 662, 244 S.W.2d 660, 661 (1951).

### KOURA TRACT

On Imperial's instructions, Scholnick instructed the Adams firm to search for addi-

tional alternative sites for an apartment project. In addition to the Horsefarm tract discussed *supra,* that firm located the Koura Tract consisting of twelve acres and procured a sales contract from its owners. Scholnick deposited $1,000 from his own funds with the agreement that if he deposited an additional sum of earnest money in the amount of $24,000 the entire deposit was refundable within sixty days if the contract was rejected within that time. Scholnick executed the contract for Imperial and transmitted a copy to Imperial. Scholnick advised Imperial that the Koura Tract "[was] better located than the Sun Ridge Project" for an apartment site. Thereafter, Libling and Scholnick discussed the Koura tract in a telephone conversation on March 11, 1983. Scholnick stressed to Libling the excellent quality of the land for an apartment site. At this point, Libling rejected the Koura tract for the stated reason that Imperial did not desire to begin another apartment development until Sun Ridge was completed and advised Scholnick that Imperial would not reimburse him for the $1,000 initial deposit.

Scholnick informed the Charlie Adams firm that Imperial had decided to "hold off" and, as with the Horsefarm property, he and the Charlie Adams firm decided to pursue the Koura Tract jointly. On March 23, 1983, Scholnick, in his capacity as vice president of Imperial Group (Texas), Inc., assigned all rights in the Koura contract to M-Jay Developments, Inc., assignee, by Ira Scholnick. This assignment was made without consideration as to Imperial and without its knowledge. The record shows that on June 10, 1983, M-Jay entered into a contract of sale to convey the Koura Tract to a third party, and that on August 29, 1983, M-Jay closed its purchase of Koura and at the same time conveyed the land to the third party realizing a profit of $224,-355.36 of which M-Jay/Scholnick received a net profit of $104,562.01.

At trial, the jury found that Scholnick disclosed the material facts surrounding the opportunity to purchase Koura to Imperial.[6] Imperial assails this finding under points of error five and nine, claiming that the evidence is legally and factually insufficient to support the same. The jury also found that Imperial would not have acquired the tract.[7] Under points of error six and eight, Imperial argues that the court erred in refusing to disregard the jury's finding that it would not have acquired the Koura tract because it is without support in the evidence, or alternatively, the finding is immaterial. By points ten and seven Imperial contends that that finding is against the great weight of the evidence, and that in transferring Imperial's rights as purchasers under the Koura contract to M-Jay without consideration and without Imperial's knowledge, Scholnick breached his fiduciary duty and is thus liable to Imperial for the profits obtained in the Koura transaction.

█ Our review of the evidence persuades us that the finding by the jury that Scholnick made a full disclosure of the corporate opportunity to purchase the Koura tract is supported by the evidence. There is sufficient evidence in the record that Libling was aware that the market value of land located in the vicinity of the Koura Tract was on the rise. Scholnick's recommendation that Imperial purchase the tract upon reasonably favorable terms as set forth in the contract of sale sufficiently apprised the principal corporate officer of the opportunity presented for either development or *investment* purposes. It is undisputed that at the time, March 1983, Scholnick advised Libling of the availability of this tract, Scholnick had not found a buyer for a price that would produce a profit. Imperial rejected the Koura Tract. Under these circumstances when Imperial rejected the opportunity to purchase Koura, Scholnick was free to do so. Points five, six, eight, nine and ten are overruled.

█ When Imperial rejected the opportunity to purchase the Koura tract, Scholnick

---

6. Jury's response to Special Issue No. 3.

7. Jury's response to Special Issue No. 4.

had several plausible courses of action to follow if he was not interested himself in purchasing Koura—he could let the contract expire for failure to escrow the additional $24,000 in earnest money and lose his $1,000 initial deposit; or if he was interested in the property, as he obviously was, he could, without harm to his corporation, personally assume the place of Imperial and put up the additional sum required to continue the contract in force. The fact that he purported to act for Imperial in assigning the purchasers' rights under the contract to M-Jay in no way harmed Imperial, and in fact, as Scholnick obliquely contends, Imperial had no standing to complain of the procedure utilized in this instance to "undo" the relationship between the seller and Imperial which was rejected by Imperial. Point seven is overruled.

### PARDUE TRACT

Scholnick acting through an agent located the Pardue Tract consisting of 48 acres of land valuable for commercial use. Scholnick, in partnership with a Canadian corporation, Financial Trustco, purchased the tract without disclosing the opportunity to purchase the same to Imperial. A contract of sale between Trustco and Scholnick as purchasers and the owners/sellers of Pardue was entered on August 11, 1983. Trustco furnished the entire amount of the earnest money deposited in the sum of $50,000. On September 8, 1983, before an additional earnest money deposit of $250,-000 was due under the terms of the contract, Trustco and Scholnick assigned their rights to third parties. On January 4, 1984, simultaneous closings occurred on the contracts. Scholnick realized a net profit of $944,097.70 on the transaction.

The jury, while finding that Imperial possessed sufficient capital funds to purchase a one-half interest[8] in the Pardue Tract,[9] also found that the opportunity to purchase

the tract was not within the normal line of business of Imperial.[10] Imperial challenges the finding that the Pardue opportunity was not in the normal line of business of Imperial by points of error twelve and sixteen, contending respectively that the finding has no support in the evidence and that such finding is so contrary to the great weight and preponderance of the evidence as to be manifestly wrong and unjust.

As discussed relative to the Horsefarm tract,[11] a fiduciary is obligated to serve the corporation's interest with undivided loyalty and in the utmost good faith. At issue here is the extent of that obligation, in other words, what are the limits of the "corporate interests" that a fiduciary must serve unselfishly? In *Guth v. Loft*, 23 Del. 255, 5 A.2d 503 (1939), the court stated the general rule that when an opportunity comes to a corporate officer or director "in his individual capacity, and is one in which the corporation has no interest or expectancy, the officer may treat it as his own [citations omitted]." *Id.* 5 A.2d at 510–511. The *Guth* court, in discussing the defense presented by Guth that the business opportunity seized by him was "not in the line of Loft's activities," commented that the phrase "in the line" of business cannot be precisely defined but that

[i]t has a flexible meaning, which is to be applied reasonably and sensibly to the facts and circumstances of the particular case. Where a corporation is engaged in a certain business, and an opportunity is presented to it embracing an activity as to which it has fundamental knowledge, practical experience and ability to pursue, which, logically and naturally, is adaptable to its business having regard for its financial position, and is one that is consonant with its reasonable needs and aspirations for expansion, it may be

---

8. Scholnick acquired a one-half interest in Pardue.

9. The finding was in response to Special Issue No. 5(b).

10. The finding was in response to Special Issue 5(a).

11. *Supra* at 362–363.

properly said that the opportunity is in the line of the corporation's business. *Id.* at 514. That test, being adaptable to the many different situations to which the "in the line" of business requirement may be applied, appropriately defines the scope of the inquiry to be made in any given situation.

■■■ From our review of the record in keeping with the well-established rule of *Garza v. Alviar*, 395 S.W.2d 821 (Tex. 1965), we conclude that there is some evidence tending to support the finding that the acquisition of the Pardue tract was not in the normal line of Imperial's business at the time it was acquired by Scholnick.[12] Thus we overrule point 12.

The challenge to the factual sufficiency of the evidence supporting the finding requires that we examine and weigh all of the evidence in the record. Such review reveals that Imperial, at the time of Scholnick's acquisition of the contract covering the Pardue Tract was engaged in the real estate business, primarily purchasing land for development for commercial and multi-unit residential purposes. It is true as Scholnick argues that the primary thrust of Imperial's operations was purchase of land for development, that is, the development of projects rather than making speculative investments in real estate in the Dallas market. It is clear that business conditions in Canada were in a state of depression, and at the time, Imperial was cutting back on its acquisition of land in Canada; at the same time opening an office in Dallas in an attempt to find an alternative source of income and revenue for the corporation. While its primary focus was on development of property for apartment rental and sale, the record leaves no doubt that Imperial did make investments in commercial real estate. The record demonstrates that Imperial's business was not so limited as Scholnick claims; and further, that he

knew it was not so limited. An official policy directive,[13] mailed in 1981 to Scholnick and other officers and agents in the field, advised that while Imperial was "development orientated," "[f]rom time to time ... investment objectives of the group could change so it is only prudent that the division staff keep head office and hence the management committee informed." The evidence reveals that Scholnick was prominent in the affairs of Imperial in 1981,[14] and that he made several recommendations to Imperial's board of directors that year, including recommendations relating to commercial development by Imperial in Canada.

Scholnick's immediate superior, Gerald Libling, a member of the "core group" and chief executive officer of Imperial, testified that Scholnick was initially dispatched to Dallas in 1982 to "do an overall assessment of the [real estate] market." At that time, according to Libling's testimony, Sig Goodman was representing Imperial in the Dallas area in locating and developing land sites for shopping centers. Goodman resigned his employment with Imperial in January 1983 and was not replaced, leaving Scholnick as Imperial's sole representative in that market. Libling also testified that Goodman located lands for Imperial in Dallas which were purchased and resold for profit, resulting from appreciation in value. Sid Goodman himself testified that he had on numerous occasions bought and sold raw lands on Imperial's behalf. And while Goodman did testify that Imperial "never would have acquired [the Pardue lands]," he also testified that Imperial would have been interested in the Pardue transaction with a partner in the transaction willing to put up the escrow money, especially if the partner was Financial Trustco. Pete Skynner, an officer of Imperial's, testified by deposition that under Imperial's criteria for purchase of real estate, "projects were al-

12. The record contains some testimony to the effect that Imperial was not purchasing property only to re-sell it at the time Scholnick bought the Pardue tract, and suggesting that Imperial was no longer interested in property in the Dallas area at the time.

13. Defendant's Exhibit No. 42.

14. Plaintiff's Exhibit 108.

ways submitted on a project-by-project basis." Skynner also stated that Imperial was an "experienced real estate development entity." Furthermore on cross examination, Skynner testified that as "a matter of common, ordinary custom," property was evaluated from all aspects, and that Imperial had no general criteria which imposed specific limitations upon acquisitions. He also testified that "we always consider the potentiality of selling a piece of land to make a profit when we purchase it as well as development [sic].... I suppose you could say every piece of property is considered as a potential sale for profit."

We reject Scholnick's argument that the undisputed evidence of the size of the Pardue tract, Imperial's policy of curtailing its operations in Florida and California, and the Canadian depression, as well as testimony tending to show that Imperial rarely, if ever, made investments in "raw land" for purpose of investment and resale for profit, constitutes sufficient evidence to support the jury's finding that the Pardue tract was not in the normal line of Imperial's business. The testimony above discussed, as well as the evidence showing Imperial's assets, financial worth and its financial strength, together with evidence discussed previously in this opinion, establishes without dispute that the officers, agents and employees of Imperial possessed the necessary knowledge, practical experience and ability and business contacts with lenders and real estate brokers to take advantage of the Pardue opportunity.

Scholnick also urges that the evidence showing that Imperial was closing offices and attempting to defer debt obligations in its response to the depression in Canada supports the finding by the jury that the Pardue transaction, which he termed a "high risk" investment, was outside of Imperial's line of business. Most, if not all, of

the testimony relied upon by Scholnick in support of his argument indicates that *perhaps* Imperial might have rejected the opportunity to purchase the Pardue tract under the circumstances here presented as the jury found, but such evidence falls far short of demonstrating that the Pardue transaction was outside the line of business of Imperial at the time.

Based on our careful review of all the evidence [15] and construing the finding in light of the evidence, we conclude that the jury finding that the Pardue tract was not in the normal line of Imperial's business is so contrary to the overwhelming weight and preponderance of the evidence as to be manifestly wrong and unjust. Point sixteen is sustained.

▉ We also conclude that Imperial's point of error 15 should be sustained and hold that the jury finding in response to Special Issue No. 5(c) that Imperial would not have acquired the Pardue tract under the same terms and conditions as Scholnick acquired it, is immaterial and may be disregarded.[16] A business opportunity, the Pardue transaction, which was well within the scope of the activities and business of Imperial, was presented to Scholnick and as its fiduciary, he had an absolute and unconditional legal and moral duty to disclose that opportunity to Imperial. That is the core and basis of the equitable rule. Courts of equity should not recognize a rule regarding transactions of the character here involved which permits the corporate fiduciary to escape his duty to disclose the opportunity presented by securing an after-the-fact finding by the trier of the facts that the corporation was unable to take advantage of or would have rejected the business opportunity seized by the fiduciary had it been offered. *Energy Re-*

---

**15.** *See Garza v. Alviar,* 395 S.W.2d 821, 823 (Tex.1965), and *In re King's Estate,* 150 Tex. 662, 244 S.W.2d 660, 661 (1951).

**16.** Scholnick also argued that Financial Trustco, his partner in the Pardue deal, would not have put up all of the earnest money with Imperial as a partner, *i.e.,* that Trustco would not have

made the same deal with Imperial that it made with him. That argument must fail because Scholnick made no effort to secure the same arrangement with Trustco on behalf of Imperial. *See* 3 W. Fletcher *Cyclopedia of the Law of Private Corporations* § 862.1 (rev.perm.ed.Supp. 1985).

*sources Corp. v. Porter,* 14 Mass.App. 296, 438 N.E.2d 391, 394–395 (1982) (and authorities cited therein); *see also Graham v. Mims,* 111 Ill.App.3d 751, 67 Ill.Dec. 313, 444 N.E.2d 549 (1982). To permit the destruction of a corporate fiduciary's duty to disclose the material facts of any given transaction within the line of his corporation's business by such means necessarily will operate to encourage dishonesty and infidelity on the part of the fiduciary in self-dealing. As our Supreme Court stated in *Johnson v. Peckham,* 132 Tex. 148, 120 S.W.2d 786, 788 (1938), "[W]hen persons enter into fiduciary relations each consents, as a matter of law, to have his conduct towards the other measured by the standards of the finer loyalties exacted by the courts of equity. That is a sound rule and should not be whittled down by exceptions."

In the case before us, Scholnick had already notified Imperial of his intent to leave its employ at the time he purposefully, and while still drawing his pay from Imperial, embarked on a search on "company time" for a profitable investment in real estate in the Dallas area for his own account. In so doing, he took advantage of both his office with Imperial and business connections made while in its employ to launch his campaign for personal profit. Point fifteen is sustained. Because of our rulings on points twelve, fifteen and sixteen, we need not address points thirteen[17] and seventeen.[18]

■ Imperial's point eleven[19] is overruled because the finding that Imperial was financially strong enough to purchase Pardue, standing alone, did not impose a duty on Scholnick to disclose that opportunity to

Imperial before he appropriated the same for himself. Indeed, if the evidence was factually sufficient to support the jury finding that the Pardue transaction and opportunity was not in the line of Imperial's business, Scholnick would have had no duty to disclose it to Imperial. *See Guth v. Loft,* 23 Del. 255, 5 A.2d 503 (Delaware 1939).

## SCHOLNICK'S COUNTERCLAIM

Scholnick brought a counterclaim against Imperial alleging that Imperial had loaned him $50,000 to purchase a home and $135,000 to invest in certain tax shelters termed "MURB" investments, and that Scholnick was entitled to "a declaratory judgment that such sums were de facto bonus payments, and deduct the appropriate sums thereof from any recovery of bonus sought in these pleadings." His counterclaim also alleged that Imperial owed him $1,300,000 in unpaid bonuses. The trial court entered a declaratory judgment for Scholnick on a portion of his counterclaim.

By points eighteen and nineteen, Imperial claims the trial court erred in rendering a declaratory judgment that the house loan and MURB investments were not personal obligations, but *de facto* bonuses, because there was no support in the pleadings, the evidence or the jury findings and because such judgment is contrary to the jury findings.

Libling testified that the $50,000 interest free loan to Scholnick was to be secured by a second mortgage and was for a term of five years.[20] It was agreed that this loan would be repaid out of Scholnick's bonuses. The evidence also shows without dispute

---

**17.** Point thirteen claimed error in the trial court's failure to disregard the finding that Imperial would not have acquired the Pardue tract under the same terms and conditions as Scholnick did on the ground that such finding was without support in the evidence.

**18.** Point seventeen claimed that a new trial should have been granted because the finding discussed in note 16 was not supported by factually sufficient evidence and is against the overwhelming weight of the evidence.

**19.** By point eleven, Imperial claims that the undisputed fact of nondisclosure regarding the Pardue opportunity, taken together with the jury's finding that Imperial was financially able to acquire the Pardue tract under the same terms and conditions as Scholnick, did establish as a matter of law that Scholnick acquired the tract in violation of his fiduciary duty to Imperial.

**20.** Plaintiff's Exhibit No. 22.

that if Scholnick left his employment with Imperial, the loan would become due and payable at the end of the 90 day notice period.

Scholnick's testimony regarding the MURB investments was as follows:

Q. And how was that presented to you?

A. It was presented that at each year units would be made available to senior employees in these M.U.R. V.s. [sic] So that in lieu of, say, receiving a cash payment under your bonuses they would give you an ownership unit in some project that we would bill so you would get some tax benefits as well.

Q. And what was your understanding of how those obligations that you would incur in order to be and to buy a M.U.R.V. [sic] be repaid?

A. They would be repaid by crediting or debiting the amounts due under your bonus so instead of giving you cash under the bonus arrangement they would say, fine, we will allocate X number of dollars toward the purchase of M.U.R.V. [sic] units.

Q. So whatever you might owe for the M.U.R.V.s [sic] that you earned must be subtracted from this bonus?

A. It would reduce that.

Q. Do you have an approximate figure for that?

A. That could be in the range, I think, of $200,000.00 possibly. I don't

have an exact. I think approximately.

Q. It should be reduced from your bonus claim to pay for the M.U.R.V.? [sic]

A. Yes.

The special issues material to Scholnick's counterclaim were numbers 12 through 19. The jury found in answer to number 12 that Defendant's Exhibit 28 [21] did not embody the terms of the bonus agreement between Scholnick and Imperial, and as instructed did not answer Special Issues 13 through 16 relating to bonuses. In response to Special Issues 17 and 18, the jury found that it was agreed that Scholnick would forfeit all bonuses if he voluntarily left Imperial, and that Scholnick would forfeit all bonuses if he was terminated for just cause. In answer to Special Issue 19,[22] the jury found that Scholnick *was not* terminated for just cause.

■ The trial court's declaratory judgment that the $50,000 house loan was not a personal obligation of Scholnick is not only without support in the evidence, the evidence conclusively establishes the contrary. Libling's testimony and Scholnick's own memorandum prove the loan *was* a personal obligation of Scholnick. Additionally, the judgment finding has no support in the verdict. Imperial's points eighteen and nineteen are sustained.

21. Defendant's Exhibit 28 was a lengthy document written by Scholnick in two parts, the first a handwritten memorandum, and the second a typewritten instrument regarding "Proposed Compensation for I. Scholnick." The handwritten portion of the exhibit was directed to J. Raisen, a member of the "core group" and the second part was delivered or mailed to the "core group" according to Scholnick's testimony. Defendant's Exhibit 28 was introduced during Scholnick's testimony and the dialogue between counsel and the court strongly suggests that the handwritten portion of the exhibit as here presented is not in fact a part of Exhibit 28 as offered. Nevertheless, we consider the exhibit as presented to us in the record.

22. Special Issue No. 19 inquired:

Do you find from a preponderance of the evidence that Ira Scholnick was terminated for just cause?

You are instructed that the term 'just cause' means a failure by Ira Scholnick to substantially perform his duties in a manner in which those duties would have been performed by a corporate officer having the skill, knowledge, expertise, loyalty, fidelity, integrity, honesty and good faith of a corporate officer ordinarily performing such services; or the commission by Ira Scholnick of acts which a corporate officer having the skill, knowledge, expertise, loyalty, fidelity, integrity, honesty and good faith of a corporate officer ordinarily engaged to perform such services would not have committed under the same or similar circumstances.

Answer 'We do' or 'We do not.'

ANSWER: We Do Not.

Scholnick also sought recovery of $13,000 in unpaid salary. The trial court apparently granted this relief based on the jury's finding in response to Special Issue 19 that Scholnick was not terminated for just cause.[23] Imperial argues that the answer does not constitute a finding that Scholnick was terminated without just cause.[24] We agree. *C. & R. Transport, Inc. v. Campbell,* 406 S.W.2d 191, 194 (Tex. 1966). In the absence of such a finding, the court's stated reason for the award, and thus the award, must be reversed unless supported by conclusive evidence in the record. We conclude that the evidence does not conclusively establish that Scholnick was terminated without "just cause." Since Scholnick failed to secure a jury finding that his employment was terminated without "just cause," he waived his right to recover any portion of his annual salary due him after his employment was terminated by Imperial. Tex.R.Civ.P. 279; *Denton Publishing Co. v. Boyd,* 460 S.W.2d 881, 885 (Tex.1970). Point twenty is sustained.

Scholnick further alleged in his counterclaim that Imperial owed him $1,300,000 in unpaid bonuses. The jury found that the document Scholnick relied on to establish the unpaid bonus, Defendant's Exhibit No. 28,[25] did not embody the terms of the bonus agreement. Libling testified that Scholnick had proposed such a bonus arrangement and that the proposal was rejected.

The judgment below denies recovery to Scholnick for unpaid bonuses and attorney's fees related to his suit for bonuses. Scholnick attacks the judgment in these respects by four cross-points.[26] By his first cross-point, Scholnick alleges that the jury's finding that Defendant's Exhibit No. 28 did not embody the agreement between Imperial and Scholnick as to bonuses [27] is against the great weight and preponderance of the evidence. He urges, under his second cross-point, that the trial court should have disregarded the jury's answer to Special Issue 12 because Imperial had judicially admitted that Defendant's Exhibit No. 28 was the "employment contract." Under cross-points three and four, Scholnick argues that because of the jury's findings that if Scholnick voluntarily left Imperial's employ,[28] or if he was terminated for just cause,[29] he would forfeit all bonuses

23. *Id.* In the judgment, the court stated that the $13,000 is awarded to Scholnick "as a result of his termination without 'just cause.'"

24. By point 20, Imperial challenges the entry of declaratory judgment in Scholnick's favor awarding him $13,000 unpaid salary. The basis for point 20 is that the judgment was based upon a finding that Scholnick's employment was terminated without just cause, and alleges that there was no such finding.

25. *See supra* note 21.

26. Erroneously denominated "counter-points."

27. That finding was in response to Special Issue No. 12 which reads:
Do you find from a preponderance of the evidence that Defendants' Exhibit 28 embodied the terms of the bonus agreement, if any, for Ira Scholnick, as agreed to between the parties?
Answer 'We do' or 'We do not.'
ANSWER: We Do Not."
The instructions in the special issues then directed the jury:
"If you have answered Special Issue No. 12, 'We do,' then answer Special Issue No. 13; otherwise, go to Special Issue No. 17."

28. The jury so found in response to Special Issue No. 17, which reads:
"Do you find from a preponderance of the evidence that it was the agreement of the parties that should Ira Scholnick voluntarily leave Imperial he would forfeit all bonuses?
"Answer 'We do' or 'We do not.'
"ANSWER: We do."

29. The jury so found in response to Special Issue No. 18, which reads:
"Do you find from a preponderance of the evidence that it was the agreement of the parties that should Ira Scholnick be terminated for just cause he would forfeit all bonuses?
"You are instructed that the term 'just cause' means a failure by Ira Scholnick to substantially perform his duties in a manner in which those duties would have been performed by a corporate officer having the skill, knowledge, expertise, loyalty, fidelity, integrity, honesty and good faith of a corporate officer ordinarily performing such services; or the commission by Ira Scholnick of acts which a corporate officer having the skill, knowledge, expertise, loyalty, fidelity, integrity, honesty and good faith of a corporate officer ordinarily engaged to perform such services would not have committed under the same or similar circumstances.

and that he was not terminated for just cause,[30] the court should have awarded him recovery for bonuses and attorney's fees.

▮▮▮ Scholnick's cross-point 1, an insufficient evidence and against the overwhelming weight point, requires review of the relevant evidence. Defendant's Exhibit No. 28 bore no signature, its title read in part, *"Proposed* Consideration for I. Scholnick." (Emphasis added.) Libling testified that the proposal was rejected by Imperial; Scholnick testified that Imperial agreed to its provisions respecting bonuses for him. Because the evidence was conflicting respecting the bonus issue, the jury, as the trier of the facts and sole judges of the credibility of the witnesses, was entitled to accept or reject all or any part of the testimony of any witness. The jury refused to find that the exhibit "embodied the terms of the bonus agreement ... between the parties." Its finding is not so against the great weight and preponderance of the evidence as to be manifestly wrong or unjust. Cross-point one is overruled.

We have carefully reviewed the record in our consideration of Scholnick's cross-point No. 2. The record does not support Scholnick's argument that Libling made a judicial admission that Defendant's Exhibit No. 28 constituted the agreement of the parties as to bonus payments to Scholnick. That portion of the record to which Scholnick's arguments direct us reveals that Libling stated that he did not even refer to the exhibit in question in his earlier deposition testimony taken for use in a Canadian suit between the parties. Certainly Libling's testimony cannot be regarded as a clear testimonial admission as claimed by Scholnick. Cross-point two is overruled.

By his cross-points three and four, Scholnick claims that the court erred in rendering a take-nothing judgment against him on his action for unpaid bonuses and attorney's fees relating thereto. In summary, Scholnick's arguments in support of these points are (1) that Imperial admitted that Scholnick's bonus was at least one and one-half percent of his annual salary when a figure based upon that formula was brought out by Imperial's counsel on cross-examination of Scholnick, and he should therefore recover at least the amount of the computation of unpaid bonuses made by Imperial's counsel during cross-examination; (2) that the answer to Special Issue 20 [31] also forms a basis for judgment in his favor on the bonus issue; and (3) that the jury's finding of attorney's fees is supported by the evidence. As is obvious, the argument made does not exactly comport with the language of cross-point three which claims the court should have awarded Scholnick's judgment for unpaid bonuses because of the findings made in Special Issues 17–19.[32] In any event, Scholnick's arguments on these cross-points ignore the testimonial and documentary evidence adduced at trial to the effect that payment of bonuses was discretionary on the part of Imperial. The contention that the jury findings that Scholnick's bonuses would be forfeited by his voluntary act in leaving his employment or his termination by Imperial for "just cause," standing alone, provide no basis for a judgment in his favor for unpaid bonuses and attorney's fees. In short, Scholnick failed to prove the terms of Imperial's agreement to pay him annual bonuses. He attempted to prove the terms by Defendant's Exhibit 28 and his testimony previously discussed.[33] The jury rejected his testimony that the bonus agreement

"Answer 'We do' or 'We do not.'
"ANSWER: We do."

**30.** *See supra* note 22.

**31.** Special Issue No. 20 inquired:
"What sum of money, if any, do you find from a preponderance of the evidence is a reasonable attorney's fee for Defendant Ira Scholnick relating to his claim for unpaid bonuses?" The jury found that $75,000 for services in the

trial court, $8,000 for services in the Court of Appeals, and $5,000 for services in the Texas Supreme Court is a reasonable attorney's fee.

**32.** *See supra* notes 22, 28 and 29 and accompanying text for discussion of Special Issues 17–19.

**33.** *See supra* discussion at 369.

was "embodied" in the exhibit. Libling testified that the declaration of bonuses for Scholnick was discretionary. That testimony is supported by documentary evidence as well. Scholnick testified that the word "discretionary" referred to in the exhibit referred to the staging or "timing" of the payment of bonuses and not to the payment itself. No issue was submitted to the jury for resolution of this dispute. Since Scholnick bore the burden of proving a "nondiscretionary" bonus agreement, his failure to submit an issue thereon is fatal to his claim for unpaid bonuses and attorney's fees relating thereto. Cross-points three and four are therefore overruled.

We find that the judgment below is severable in the following respects: We reverse that part of the judgment adjudging that Imperial take nothing of and from Scholnick and M-Jay regarding the profits realized by them from the purchase and sale of the Horsefarm-Houseman tracts, and here render judgment that Imperial Group Texas, Inc., Groveridge Imperial Properties, Ltd., Groveridge Imperial Properties (Calgary), Ltd., Imperial Developments (Canada) Ltd. and Imperial Group Corporation do have and recover of and from Ira Scholnick and M-Jay Developments, Inc., jointly and severally, the sum of $121,978.25, together with prejudgment interest at the rate of 10.32%, compounded daily, from March 30, 1983, until November 30, 1984, and postjudgment interest thereon at the rate of 10.32% from November 30, 1984, until payment in full of the judgment amount. We further render judgment imposing a constructive trust in favor of the Imperial Group of companies as designated above, in and against real and personal properties described in the Appendix hereto attached, to the extent of the total judgment amount, hereby adjudging that Ira Scholnick, M-Jay Developments, Inc. and Rochelle Scholnick hold title to such properties in trust for the Imperial Group of companies, for the satisfaction of the judgment here rendered. We also reverse those parts of the judgment below declaring that Ira Scholnick and Rochelle Scholnick are not personally liable to Imperial on

account of the multiple unit resident buildings investments (MURBS) in the form of promissory notes or other written obligations and the $50,000 house loan made by Imperial to Ira Scholnick and wife, Rochelle Scholnick, as a part of the purchase price for a residence in Calgary, Canada. We render judgment that the relief sought by Scholnick in his counterclaim under the Declaratory Judgment Act be in all things denied as to the MURB obligations and the house loan. We also reverse those parts of the declaratory judgment below awarding Scholnick recovery of $13,000 for unpaid salary as alleged in his counterclaim and $5,000 in attorney fees, and here render judgment that Scholnick take nothing by his counterclaim for relief under the Declaratory Judgment Act for unpaid salary and attorney fees. That part of the judgment adjudging that Imperial take nothing of and from Scholnick and M-Jay as to the profits realized by them from the purchase and sale of the 48-acre tract known as the Pardue lands, on the causes of action asserted by Imperial against Ira Scholnick and wife, Rochelle Scholnick, and M-Jay relating thereto is reversed, severed and remanded for new trial on the merits. In all other respects the judgment is affirmed.

All costs in the trial court and this court are assessed against Ira Scholnick and M-Jay, jointly and severally.

APPENDIX

Lot 15, Block 3–8760, Bent Trial Addition, Phase I, located at 5935 Desert Trail, Dallas and Collin Counties, Texas.

Certificate of Deposit No. 419202 issued by Mercantile National Bank of Dallas to Ira Scholnick in the principal amount of $335,000.

All that certain lot, tract or parcel of land lying and being situated in Denton County, Texas, in G. Syms Survey, Abstract No. 1200, and the L.L. Finley Survey, Abstract No. 424, and being more particularly described as follows:

BEGINNING at a point in the west line of the L.L. Finley Survey, said point being

North 0 degrees, 25 minutes, 30 seconds West, 243.41 feet from the Southwest corner of said L.L. Finley Survey, an iron stake for corner;

THENCE North 0 degrees, 25 minutes, 30 seconds West along the West line of said L.L. Finley Survey and the West line of the G. Syms Survey, 369.20 feet to an iron stake for corner;

THENCE North 89 degrees 00 seconds East, 537.76 feet to an iron stake for corner;

THENCE South 0 degrees, 13 minutes, 46 seconds West, 621.62 feet to a point in the South line of L.L. Finley Survey, an iron stake for corner;

THENCE South 89 degrees, 57 minutes, 41 seconds West, along the South line of said L.L. Finley Survey, 258.07 feet to an iron stake for corner;

THENCE North 0 degrees, 54 minutes, 52 seconds West, 248.27 feet to an iron stake for corner;

THENCE South 88 degrees, 56 minutes, 08 seconds West, 270.47 feet to the PLACE OF BEGINNING, and containing 6.035 acres of land.

All those certain lots, tracts and parcels of land situated in Tarrant County, Texas, and described as follows:

### TRACT I: (SALLEE)

BEGINNING at the Southwest corner of the said G.W. Minter Survey, said point being in the intersection of Glade Road (County Road No. 3036) and North Main Street (County Road No. 3129) a ½ inch iron pin set in the North and East right-of-way line of said Roads bears North 48 degrees 25 minutes 20 seconds East 38.15 feet;

THENCE North 00 degrees 40 minutes 00 seconds West along said road and the West line of said Minter Survey, 683.04 feet to a point for corner, from which a ½ inch iron pin bears South 89 degrees 41 minutes 39 seconds East 26.23 feet, said point also being the Southwest corner of Marvin C. Sims, Jr. Tract and the most Westerly Northwest corner of E.D. Sallee

Tract as per boundary line agreement between Marvin C. Sims, Jr. and E.D. Sallee, dated January 1984;

THENCE South 89 degrees 41 minutes 39 seconds East along a fence and the common line of said agreement, at 26.23 feet passing a ½ inch iron pin in the fenced East right-of-way line of said North Main Street, in all 645.72 feet to a 1 inch iron pin at a fence corner, for corner;

THENCE North 00 degrees 37 minutes 10 seconds West along a fence and the common line of said agreement, 316.03 feet to a ½ inch iron pin at a fence corner, for corner;

THENCE South 89 degrees 38 minutes 19 seconds East along a fence, 352.48 feet to a ½ inch iron pin at a fence corner;

THENCE South 00 degrees 54 minutes 00 seconds West along a fence 968.46 feet to a axle for corner in the fenced North right-of-way line of said Glade Road;

THENCE West along the said fenced North right-of-way line, 323.33 feet to a ½ inch iron pin;

THENCE South 00 degrees 47 minutes 00 seconds East 25.0 feet to a point for corner in the South line of said Minter Survey and in said Glade Road;

THENCE West along said survey line and road, 648.61 feet to the POINT OF BEGINNING, and containing approximately 17.654 acres of land, of which 0.792 acres lies within said Roads, leaving approximately 16.862 acres of land or 734.537 square feet.

### TRACT II (SIMS)

All that certain lot, tract or parcel of land, lying and being situated in Tarrant County, Texas, and being described as follows, to-wit:

BEING a tract of land out of the G.W. MINTER SURVEY, Abstract No. 1083, in Tarrant County, Texas, and being described by metes and bounds as follows:

BEGINNING at an iron pin in the East line of County Road No. 3129, said pin

being North 675.0 feet and East 25.0 feet from the Southwest corner of said Minter Survey;

THENCE North 02 degrees 38 minutes West along the East line of said road 316 feet to an iron pin for corner;

THENCE East along a fence 619.2 feet to an iron pin for corner;

THENCE South 00 degrees 56 minutes East along a fence 316.3 feet to an iron pin for corner;

THENCE West along a fence 609.8 feet to the POINT OF BEGINNING containing approximately 4.46 acres of land and being the same tract of land as recorded in Volume 3202, Page 409, Deed Records of Tarrant County, Texas.