**UNITED TEACHER'S ASSOCIATES INSURANCE COMPANY**

v.

**MACKEEN & BAILEY, INC., and W. Duncan MacKeen, Individually**

v.

**Hoyt W. WHIDBEE, Jr., David M. Morgan, United Teacher's Associates, Inc., and the Whidbee Corporation.**

No. A 93 CA 026 SS.

United States District Court, W.D. Texas, Austin Division.

March 8, 1994.

---

Donald R. Taylor, Akin, Gump, Strauss, Hauer & Feld, Joe K. Longley, Longley & Maxwell, David E. Dunham, Nanette K. Beaird, Akin, Gump, Strauss, Hauer & Feld, Austin, TX, for United Teacher's Associates Ins. Co.

Floyd R. Nation, Arnold White & Durkee, Austin, TX, Randolph M. James, McCall & James, Winston–Salem, NC, Jefferson C. McConnaughey, McKenzie, Martin, Taylor & McConnaughey, P.C., Atlanta, GA, for MacKeen & Bailey, Inc. and W. Duncan MacKeen.

SPARKS, District Judge.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

BE IT REMEMBERED that on Monday, the 31st of January, 1994, the parties commenced trial in the above-captioned case. All parties stipulated to a bench trial and were present and represented by counsel for five full days of trial. Having carefully considered the evidence presented at trial along with the oral arguments and written briefs of counsel, the Court enters the following findings of fact and conclusions of law.

### Venue and Jurisdiction

On January 13, 1993, the Court acquired jurisdiction over this case when Defendants removed from the District Court of Travis County, Texas, 200th Judicial District. The plaintiff, United Teacher's Associates Insurance Company (hereinafter "UTAIC"), is a corporation organized and existing under the laws of the State of Georgia and having its principal place of business in Austin, Texas. Defendants, corporately and individually, are residents of North Carolina. The amount in controversy in this dispute exceeds $50,000. Hence, Defendant's removal was proper under 28 U.S.C. § 1441(a) as this Court has original diversity jurisdiction under 28 U.S.C. 1332(a). Furthermore, venue is proper under 28 U.S.C. §§ 124(d)(1) and 1391(a) as this action is brought in the Western District of Texas where the plaintiff has its principal place of business.

### Findings of Fact

In 1981, after receiving a personal loan of $3 million, David Morgan (through his corporation UTA, Inc.) acquired American Consumers Insurance Company and renamed it United Teacher Associates Insurance Company. Upon founding UTAIC, Morgan hired Hoyt Whidbee to serve as the company's president. Whidbee, who had also guaranteed the $3 million loan, obtained 10% ownership of UTAIC as part of his agreement with Morgan. UTA, Inc. held the remaining 90%.

In 1984, Whidbee retained Duncan MacKeen to provide actuarial services for UTAIC. Soon after he was retained, MacKeen suggested to Morgan and Whidbee that they, in their capacity as UTAIC, begin purchasing blocks of business from other insurance companies. MacKeen believed certain insurance companies possessed blocks of business with overstated (or redundant) reserves. He con-

vinced Morgan and Whidbee that after purchasing these blocks of business, he could recalculate the reserves and transfer them to the capital/surplus side of UTAIC's balance sheet. This recalculation and transfer would generate tremendous profits for UTAIC (or, in reality, for Morgan, Whidbee, and MacKeen). Morgan was at first skeptical. He did not understand how MacKeen could pull profits out of thin air by simply recalculating the reserves.[1] In addition, Morgan and Whidbee knew of the potential conflicts of interest these acquisitions would present to MacKeen. A 1986 letter from Peat Marwick informed them of the potential conflicts involved in MacKeen's performance of actuarial services and self interests. Nevertheless, Morgan, Whidbee, and MacKeen entered into an oral agreement whereby the three would receive equal shares of whatever profits UTAIC realized from these acquisitions. Under this arrangement, Whidbee and Morgan (through UTAIC) provided 100% of the capital to finance the acquisitions while MacKeen provided his time and actuarial expertise to locate blocks of business with overstated reserves and recalculate them after UTAIC's acquisition. In addition, MacKeen was to pay his own out-of-pocket expenses related to these acquisitions.

Because of UTAIC's limited capital, the corporation could only acquire failing blocks of business, often at a neutral or negative net value. If a block of business continued to be unprofitable after UTAIC acquired it, paying off the losses could potentially cripple the company. To avoid this downside risk to UTAIC, the three men initially agreed to create a re-insurance corporation in Arizona to be named Alpha Re, Inc. Due to financing complications, Alpha Re never materialized. UTAIC began making acquisitions in 1986 despite the failure of Alpha Re.

#### * The Retainer Agreement

Between 1986 and 1989, UTAIC made several successful acquisitions and reaped enormous profits. Pursuant to the profit-sharing arrangement, UTAIC distributed dividends from these acquisitions to Morgan and Whidbee personally and to MacKeen & Bailey, Inc. In late 1987, David Morgan began ex-

pressing his disapproval of the profit-sharing arrangement. He did not believe MacKeen & Bailey should continue to receive ⅓ of the profits when MacKeen had no capital at risk or potential personal debt. In an attempt to phase out the ⅓ profit-sharing arrangement, Morgan and MacKeen orally agreed that MacKeen & Bailey, Inc. would begin receiving a $12,500 monthly retainer fee in January of 1988. On May 29, of 1989, Morgan, Whidbee, and MacKeen formally ended their ⅓ profit-sharing arrangement and memorialized the payment of monthly retainer fees by signing a document entitled, "Retainer Agreement." Though MacKeen signed this agreement with some reservations, he acted with complete knowledge of his corporation's rights and obligations under the agreement. He was also aware that the agreement included a provision releasing any claims he or MacKeen & Bailey, Inc. had against UTAIC.

The Retainer Agreement names seven of the blocks of business (hereinafter "the Incentive Blocks") that MacKeen had helped to acquire and designates that MacKeen & Bailey, Inc. is to receive monthly disbursements based on the financial performance of these blocks. Again, prior to the agreement, UTAIC (or Morgan) had determined the amount of these disbursements to be $12,500. The agreement simply sanctions the continuation of these disbursements subject to annual adjustment. Assuming the Incentive Blocks continue to generate profits, the agreement allows the payments to continue until December 1, 1998. Though not expressed in the agreement, Morgan and Whidbee also continued to receive monthly disbursements of $12,500 in accordance with the performance of the Incentive Blocks. The agreement additionally relegates MacKeen to payment on an hourly basis for his actuarial services, including services rendered for any future acquisitions. Finally, all parties to the agreement understood that MacKeen could subsequently provide actuarial services for clients other than UTAIC.

Of the $1,810,293 MacKeen & Bailey, Inc. received from MacKeen's work for UTAIC, $750,000 is attributable to the $12,500 month-

---

1. Trial testimony revealed that MacKeen was "aggressive" in his recalculation of reserves.

ly retainer fee disbursements. UTAIC continued to pay these monthly disbursements through December of 1992, when it filed this lawsuit. Morgan and Whidbee, however, continued to collect their monthly disbursements through October of 1993.

## * The Proposed Acquisition of the Heart/Cancer Block

In the summer of 1991, National Foundation Life (hereinafter, "NFL"), a Ft. Worth based life insurance company, began experiencing regulatory pressure from the Insurance Department for the State of Delaware (the state of NFL's incorporation). NFL estimated that an increase of its capital and surplus to at least $6 million would appease the insurance regulators. NFL believed it could achieve this goal by selling selected blocks of business and began soliciting bids for these blocks in July of 1991.

On July 25, 1991, Hoyt Whidbee and Duncan MacKeen visited NFL's Ft. Worth headquarters to evaluate the Heart/Cancer Block as a possible acquisition. In David Morgan's mind, one of the sweetest aspects of the deal was the acquisition of 150,000 additional policies that he could personally broker to prospective purchasers. After appraising the block, MacKeen advised Morgan and Whidbee that the reserves were between fifty and seventy-five percent redundant and that the block would be a profitable acquisition at a purchase price of up to $18 million. About a month after the trip to Ft. Worth, on August 30, 1991, Whidbee sent a letter to James Thigpen, President and Chief Operating Officer at NFL, expressing UTAIC's intention to offer NFL $13 million for the Heart/Cancer Block. The letter states the offer would expire if NFL did not accept prior to September 12, 1991. September 12 passed without an acceptance from NFL and negotiations were suspended for several months.

On December 5, 1991, James Thigpen visited UTAIC's headquarters and succeeded in rekindling negotiations for the sale of the Heart/Cancer Block. In January of 1992, a rumor began to circulate that the reserves in the Heart/Cancer Block had been reduced by $2.5 million. Wary of this rumor, Whidbee

and MacKeen returned to NFL headquarters to re-evaluate the reserves. While they were at NFL, Thigpen received Whidbee's permission to talk with MacKeen about retaining him to assess NFL's rate increases. Consequently, MacKeen preliminarily agreed to provide actuarial services for NFL.

Following the visit to NFL, Whidbee consulted MacKeen and reviewed his re-evaluation of the reserves in the Heart/Cancer Block. Again, MacKeen's figures indicated UTAIC should purchase the block as they showed the reserves were still overstated. Whidbee sent another letter of intent to Thigpen on January 22, 1992. At this time Whidbee and Morgan knew that UTAIC was the only remaining bidder for the Heart/Cancer Block.[2] This letter offered $10 million for the purchase of the block, $3 million less than UTAIC's offer in August of 1991.

On or about the following Monday, January 27, 1992, MacKeen began evaluating the reserves in the Heart/Cancer Block on behalf of NFL. UTAIC was still under the impression that MacKeen was merely providing rate increase calculations for NFL and MacKeen did not notify them that he was, in fact, evaluating the reserves. On January 31, Thigpen sent a counter-offer to Whidbee proposing the sale of the Heart/Cancer Block to UTAIC for $14.2 million. MacKeen continued to bill UTAIC for work done on the acquisition of the block through February 6. On February 11, Whidbee sent a counter-offer to Thigpen offering to buy the block for $11 million, 3.2 million less than Thigpen's offer ten days earlier. On February 13, MacKeen submitted to NFL his recalculation of the reserves in the Heart/Cancer Block which created an additional $7.8 million in capital and surplus for NFL. Near the end of February, Thigpen contacted John Scott, the broker for the deal between UTAIC and NFL, and told him he believed the deal was probably dead. Indeed, after February 18, 1992, UTAIC and NFL never again discussed the sale of the Heart/Cancer Block.

On March 1, 1992 MacKeen signed statutory filings as actuary for both UTAIC and

**2.** The firm of Lewis and Ellis had shown some interest in the block during the summer of 1991 but had since terminated their negotiations with NFL.

NFL. Approximately two weeks later, on March 13, 1992, MacKeen began purchasing stock shares in Westbridge Capital Corporation, the parent company of NFL. At this time, the market was not aware of the $7.8 million increase in capital and surplus and its impact on Westbridge Capital's stock value. Later, on March 31, NFL published its 10K and 10Q which showed the $7.8 million increase. Westbridge Capital's stock value began to rise after this publication and has peaked at approximately $8.50 per share. MacKeen testified he purchased 46,300 shares of stock at the average price of $3.50 per share. By the summer of 1992, he had become the second largest shareholder in the company. In addition, from December 31, 1992 until the present date, NFL has been MacKeen's primary client.

## * Spring of 1992

It is important that the Court relate some events occurring in the Spring of 1992, between the failed Heart/Cancer Block transaction and the American Integrity transaction (the other transaction relevant to this lawsuit).

Since 1989, Whidbee and Morgan had been investigating the possibility of selling UTAIC and UTA, Inc. In early 1990, they retained Texas Commerce Bank to evaluate the assets of those entities and perform a preliminary market analysis for their sale. They code-named this enterprise "Project Apple." Toward the end of the first quarter of 1992, Whidbee and MacKeen began to focus more intently on the sale. They had located a possible purchaser, United Commercial Travelers Insurance Co. (hereinafter, "UCT"), and were anxious to commence serious negotiations with that company. On March 16, Whidbee, Morgan, and MacKeen signed a contract that retained MacKeen as an exclusive broker for the sale of UTAIC and UTA, Inc. to UCT. The following week, on the 24th of March, Whidbee and MacKeen traveled to Philadelphia to look at some acquisition possibilities. Over drinks in a hotel bar, MacKeen told Whidbee he had helped NFL

to reduce its reserve redundancy. He also told Whidbee he had bought numerous shares of Westbridge Capital stock. Appalled, Whidbee abruptly ended the conversation, returned to his hotel room, and called Morgan. Morgan wanted to fire MacKeen immediately. After further reflection, however, the two decided it would be wiser to keep MacKeen on retainer as he was critical to several pending transactions, especially the sale of UTAIC and UTA, Inc. to UCT. MacKeen therefore remained as UTAIC's actuary despite Morgan and Whidbee's awareness of his infidelities. UTAIC never reprimanded MacKeen for his misconduct and Whidbee even encouraged him to become president of the company.

## * The American Integrity Transaction

In May of 1992, MacKeen and Whidbee returned to Philadelphia to investigate a block of business at Union Fidelity Life. While in Philadelphia, they learned of a medicare supplement block of business for sale by American Integrity Insurance Company. They visited American Integrity and after a cursory evaluation, MacKeen told Whidbee the block of business was worthless. Whidbee did not question this appraisal and they left American Integrity shortly thereafter. Subsequently, MacKeen contacted John Scott and informed him NFL might be interested in the American Integrity block of business. MacKeen and Scott had an arrangement, unbeknownst to UTAIC or NFL, whereby MacKeen would receive a commission from Scott if NFL purchased the American Integrity block of business. On the contrary, if UTAIC purchased the block, MacKeen knew he would not receive a commission.[3] In early August of 1992, MacKeen appraised the American Integrity block for NFL. MacKeen sent Thigpen his assessment of the block on August 14, showing it to be a good buy for NFL. In early September, with John Scott acting as intermediary, NFL purchased the American Integrity

---

**3.** In the past, whenever MacKeen introduced Scott to a new client who ended up purchasing a block of business, Scott paid MacKeen a commission or finder's fee. Because Scott had not previously worked for NFL, MacKeen knew Scott would give him a commission if NFL purchased the American Integrity block. Due to Scott's previous work for UTAIC, MacKeen knew he would not receive anything if UTAIC bought the block.

block for $5 million.[4] On October 2, Scott mailed MacKeen a check (made out to MacKeen personally) for $30,000 as a commission for the NFL/American Integrity transaction.[5]

## Nature of Claims

After Defendants removed this cause to federal court, much litigious volleying and gamesmanship ensued including, *inter alia,* counterclaims, amended petitions, amended answers, amended answers to counterclaims, responses to amended answers to counterclaims, motions for sanctions, and discovery disputes. At trial, the plaintiff argued the claims set forth in its Second Amended Original Petition while the defendants developed the defenses and counterclaims established in their First Amended Answer and Counterclaims and Motions for Partial Summary Judgment.

All the plaintiff's causes of action arise out of MacKeen's conduct concerning the Heart/Cancer Block and American Integrity transactions. UTAIC alleges MacKeen's conduct with respect to these transactions amounted to, among other things, breaches of fiduciary duties, tortious interference with prospective business and contractual relations, and fraud. UTAIC's claims also sound in contract law. They aver MacKeen's actions breached and/or repudiated the Retainer Agreement and that UTAIC has no obligation to continue the retainer disbursements under that agreement.

The defendants' First Amended Answer and Counterclaim denies all the plaintiff's allegations and asserts the plaintiff's refusal to pay MacKeen's $12,500 monthly retainer fee after December of 1992 amounts to a breach of the Retainer Agreement, a breach of UTAIC's duty of good faith and fair dealing, and fraud.[6]

In the Conclusions of Law below, the Court will focus on three of the plaintiff's tort claims (violation of fiduciary duties, tortious interference with business and contractual relations, and fraud) and both parties' breach of contract claims. The plaintiff has additionally alleged tortious breach of duty of good faith and fair dealing, breach of implied covenant to perform services in accordance with the code of professional responsibility of the Society of Actuaries, negligence, negligence *per se*, gross negligence, and constructive fraud. Not to be outdone, Defendants also counterclaimed breach of duty of good faith and fair dealing and fraud. For reasons explained below, the Court views all of these as unnecessary and auxiliary tort claims and will summarily dismiss them.

## Conclusions of Law

### * Negligence, Negligence Per Se, and Gross Negligence

■ Before addressing the plaintiff's primary claims, the Court should dismiss its claims of negligence, negligence *per se*, and gross negligence. The Court finds that all of MacKeen's conduct with respect to the Heart/Cancer Block and American Integrity transactions was not merely negligent but intentional. He acted with full knowledge of all the relevant facts.

### * Violation of Fiduciary Duties

■ No caselaw in Texas supports the specific proposition that actuaries have a fiduciary relationship with their clients. Outside of the legally acknowledged fiduciary relationships, i.e. attorney/client, trustee/cestui que trust, partners, and joint venturers, Texas courts have determined whether such a relationship exists on a case by case basis. *See Thigpen v. Locke,* 363 S.W.2d 247, 253 (Tex.1962), *Consolidated Gas & Equipment Co. v. Thompson,* 405 S.W.2d 333, 336–337

4. The block has been extremely profitable for NFL. Trial evidence suggests this block would have been a profitable purchase at up to $10 million.

5. Thigpen and Mike Batte, an actuary who served as NFL's Vice–President and Treasurer, did not discover that MacKeen received a commission from Scott until their depositions in this litigation. Both testified MacKeen's failure to

inform them or anyone at NFL about his arrangement with Scott was improper conduct.

6. The counterclaims implicate Morgan and Whidbee personally but because they signed the Retainer Agreement as officers for UTAIC, UTA, Inc. and the Whidbee Corporation, they absolved themselves of personal liability.

(Tex.1966). When a fiduciary relationship is not evident as a matter of law or explicitly imposed by contract, the courts have recognized the existence of informal fiduciary relationships, also known as confidential relationships. *See Thompson v. Vinson & Elkins,* 859 S.W.2d 617, 623–624 (Tex.App.—Houston [1st Dist.] 1993, *no writ*). A person who violates a confidential relationship subjects himself to tort liability.

■ To prove the existence of a confidential relationship, the courts have required some showing that the parties shared a heightened degree of trust and confidence that surpasses what is customarily shared between business associates. The courts have often determined a confidential relationship exists where the parties have dealt with each other intimately over a long period of time. *See Lovell v. Western Nat'l Life Ins. Co.,* 754 S.W.2d 298, 303 (Tex.App.—Amarillo 1988, *writ denied*); *Cf. Crim Truck & Tractor v. Navistar Intern.,* 823 S.W.2d 591 (Tex. 1992) (suggesting that a relationship is not necessarily a confidential relationship merely because it has been a cordial one of long duration). When the parties have worked together for a long period of time to achieve common goals, they naturally develop a heightened degree of trust and confidence between them and a fiduciary or confidential relationship is likely to exist. *See FDIC v. Eagle Properties, Ltd.,* 664 F.Supp. 1027, 1029 (W.D.Tex.1985) (citing *O'Shea v. Coronado Transmission Co.,* 656 S.W.2d 557, 563 (Tex.App.—Corpus Christi 1983, *writ ref'd n.r.e*)). If the extent, nature, and duration of the relationship is such that one party has become "accustomed to being guided by the judgment or advice of the other, or is justified in placing confidence in the belief that such party would act in its interest," then a confidential relationship exists. *Thompson v. Vinson & Elkins,* 859 S.W.2d at 624 (quoting *Thames v. Johnson,* 614 S.W.2d 612, 614 (Tex.Civ.App.—Texarkana 1981, *no writ*)).

■ Clearly a fiduciary or confidential relationship existed between Morgan, Whidbee, and MacKeen—and hence between UTAIC

and MacKeen & Bailey, Inc.—at the time MacKeen recalculated reserves for NFL in January and February of 1992. For seven years, from 1985 until 1992, MacKeen had served as the only actuary for UTAIC. During that period, Morgan and Whidbee developed a great deal of trust and confidence in his work. They risked substantial amounts of capital on the accuracy (or creativity) of his reserve recalculations and the soundness of his advice. Whidbee testified he relied primarily on MacKeen's spreadsheets when drafting acquisition offers as he was not an actuary and did not have the expertise of MacKeen. MacKeen testified that prior to January of 1992, he had performed reserve recalculations for UTAIC between 80 and 100 times. Undoubtedly, the extent, nature, and duration of MacKeen's employment with UTAIC created a confidential relationship between UTAIC, MacKeen, and MacKeen & Bailey, Inc.

■ Finally and parenthetically, the Court declares that actuaries, in view of the type of professional services they provide and the information confided in them, have a fiduciary relationship with their clients as a matter of law under the criteria established by the Texas courts.

Having established the existence of a confidential relationship at the time of the Heart/Cancer Block transaction, the Court will now consider whether MacKeen's conduct breached his duties under that relationship. UTAIC has also alleged MacKeen's actions violated the Society of Actuaries' code of professional responsibility. While the breach of a code of professional responsibility does not, in itself, invoke tort liability,[7] it may be tantamount to the breach of a fiduciary duty. Thus, a brief examination of the professional responsibilities of actuaries will be helpful in determining whether MacKeen breached his fiduciary duties to UTAIC.

According to Precept 8 of the American Academy of Actuaries' Code of Professional Conduct,

---

7. For this reason, the Court does not consider Plaintiff's claim for "breach of implied covenant to perform services in accordance with the code of professional responsibility of the Society of Actuaries" as an independently valid claim.

An actuary shall not perform professional services involving an actual or potential conflict of interest unless:

(a) the actuary's ability to act fairly is unimpaired and

(b) there has been full disclosure of the conflict and

(c) all direct users have expressly agreed to the performance of the services by the actuary.

Additionally, the Society of Actuaries' Guide to Professional Conduct Rule 2.d. proclaims,

If there is any conflict of interest involving your actuarial service, you must not perform such actuarial service if the conflict makes it difficult for you to act independently. If there is a conflict or appearance of conflict, you still must not act unless there has been a full disclosure of the situation to all parties who would be concerned and your client or employer has expressly agreed to your performance of the service.

MacKeen's trial testimony acknowledged his obligations to abide by the above-described principles. He confirmed that, as an actuary, he had a duty to act with good faith, loyalty, and honesty and that he had a duty to disclose actual and potential conflicts of interest.

■ The evidence adduced at trial overwhelmingly proved that MacKeen violated his professional responsibilities and, consequently, breached his fiduciary duties with respect to the Heart/Cancer Block transaction. In January of 1992, NFL was experiencing extreme regulatory pressure and had two options to relieve that pressure: sell off the Heart/Cancer Block or determine the amount of overstated reserves in the block and convert that amount to capital and surplus.[8] Since August, Mike Batte (Vice–President and Treasurer at NFL) and Mick Diede (Batte's assistant) had wrestled with the problem of determining the precise amount of redundant reserves in the Heart/Cancer Block; the problem had them pinned. As Batte, Thigpen, and MacKeen all testified, it was no secret that the Heart/Cancer Block contained redundant reserves. Tillinghast, an actuarial firm, had informed NFL of the redundancy in August of 1991. Nevertheless, Batte and Diede later found out that the precise degree of redundancy was indeed enigmatic.[9] To make matters worse, Diede, who was most familiar with the reserve dilemma, resigned and abdicated to Georgia. Batte, the only actuary at NFL, now had five or six weeks to resolve the problem by himself. He was serving as Treasurer of NFL at the time and could not dedicate the time necessary to recalculate the reserves prior to the filing deadline. It thus appeared as if NFL would have to increase their capital and surplus by choosing the less desirable of their two alternatives, selling off the Heart/Cancer Block.

Just as it seemed Thigpen and Batte had given up on recalculating the reserves in the Heart/Cancer Block, Duncan MacKeen brightened the doorway at NFL headquarters. MacKeen had already recalculated the reserves in the Heart/Cancer Block while appraising it for UTAIC. He could perform the same task for NFL and he could do it quickly, before the February 28 deadline.[10]

---

8. At trial, several witnesses insinuated there were other ways to raise capital and surplus to relieve regulatory pressure. Even so no one specified what these alternatives were or whether they were available to NFL.

9. Several December memoranda from Diede to Batte indicate NFL was experiencing difficulty resolving this problem internally and that they were beginning to feel the heat of the forthcoming deadline.

10. Thigpen and Batte testified they did not know that MacKeen had recalculated the Heart/Cancer Block reserves while appraising the block for UTAIC and did not recognize the appearance of or potential for a conflict of interests. They conceded, however, that recalculating reserves was an important part of any appraisal. Thus, the Court discredits their testimony. A cretin could have deduced that MacKeen had already recalculated the reserves on behalf of UTAIC. In addition, Thigpen and Batte testified that MacKeen was not critical to their recalculation of reserves because Tillinghast could have performed the same task. It is doubtful, however, that Tillinghast would have been able to accomplish this task before the regulatory deadline. It is also doubtful that Tillinghast would have recalculated the reserves as aggressively as MacKeen, i.e. they would not have produced a windfall as high as $7.8 million.

Thigpen approached Whidbee and asked if he could talk to MacKeen about helping NFL with its rate increase problem. Whidbee granted permission and Thigpen eventually hired MacKeen under the pretext of performing this work. From MacKeen's billing records it appears he never performed services for NFL regarding rate increases but immediately began working on the redundant reserves in the Heart/Cancer Block. His first bill to NFL, for services rendered during January, 1992, charges $2,331.25 for "reserve and claim liability evaluation" and does not reflect any time spent on rate increase matters. This evidence along with Thigpen's lack of credibility permit the inference that Thigpen never intended for MacKeen to perform rate increase work. He hired MacKeen for the sole purpose of recalculating the reserves in the Heart/Cancer Block and eliminating NFL's need to sell that block.

MacKeen knew his recalculation of the reserves for NFL would deliver the Judas kiss to UTAIC. This fact did not concern him. His relationship with the company had become fruitless and he was still bitter about the reduction of his profits under the Retainer Agreement. A new relationship with NFL, on the other hand, represented an outstanding profit opportunity. His recalculation of the reserves would make him the company hero and would lead to additional business with NFL. Therefore, without hesitation, MacKeen switched loyalties and accepted the task of recalculating NFL's reserves.

Two weeks after NFL hired MacKeen, he reported to Thigpen that the Heart/Cancer Block contained approximately $7.8 million in redundant reserves. Not surprisingly, MacKeen had provided Whidbee with roughly the same estimate after analyzing the Heart/Cancer reserves for UTAIC.[11] This $7.8 million infusion of capital and surplus allowed NFL to relieve its regulatory pressure without selling the Heart/Cancer Block to UTAIC.

Further brightening the glare of conflict, MacKeen continued to bill UTAIC and provide Whidbee with data for the acquisition of the Heart/Cancer Block while he was working to eliminate NFL's need to sell the block. MacKeen's expert, Paul Barnhart, at first testified he saw no conflict in MacKeen's dealings with UTAIC and NFL. The following day of trial, the Court and opposing counsel apprised Mr. Barnhart of all the circumstances surrounding MacKeen's relations with UTAIC and NFL. Once fully and properly informed, Mr. Barnhart acknowledged the existence of an apparent conflict and, perhaps, an actual one.[12] It is also obvious MacKeen knew of the conflict; he knew telling Whidbee about his work for NFL would damage his relationship with UTAIC. In fact, MacKeen testified he finally told Whidbee about his work for NFL because he did not want Whidbee to find out from someone else. On the last day of trial, MacKeen virtually confessed there was a conflict and that he violated his duty to disclose that conflict. He expressed his regrets for not informing Whidbee in January of 1992 that NFL had commissioned him to recalculate the reserves.

The Court need not recount the litany of other actuarial atrocities committed by MacKeen with respect to the Heart/Cancer Block.[13] It is indisputable, based on the aforementioned evidence, that MacKeen breached his confidential relationship with UTAIC. MacKeen's actions had the effect of disclosing to NFL what he had discovered during due diligence for UTAIC[14]; a mys-

11. MacKeen had informed Whidbee the reserves were between fifty and seventy-five percent redundant. The $7.8 million figure represents a redundancy ration of fifty-eight percent.

12. As aptly stated by opposing counsel, Mr. Barnhart had somehow been proselytized overnight, much like Paul on the road to Damascus.

13. Worth mentioning, however, is MacKeen's double-billing of NFL and UTA for his firm's work on the Heart/Cancer Block. MacKeen &

Bailey billed UTA for work performed on this block on January 16th, 17th, 20th, and 21st. Later, MacKeen billed NFL for this same work even though it had been performed before NFL had even retained him. At trial, MacKeen had no explanation for this discrepancy.

14. As Thigpen stated in his deposition, an actuary performing due diligence for a client is obligated to keep his findings in strictest confidence with that client.

tery NFL was clearly unable to solve on its own. By recalculating the reserves for NFL, MacKeen took away UTAIC's motivation for purchasing the block and NFL's motivation for selling it. For these reasons, MacKeen neglected his professional responsibilities to avoid actual conflicts and disclose apparent ones; evidencing a violation of his confidential relationship with UTAIC.

■ While it is certain that MacKeen violated his fiduciary duties in the Heart/Cancer Block transaction, the Court cannot reach the same conclusion with respect to the American Integrity transaction. MacKeen's conduct in that transaction did not violate his fiduciary duty because he had terminated his confidential relationship with UTAIC prior to the transaction. *See Thywissen v. Cron,* 781 S.W.2d 682, 686 (Tex.App.—Houston [1st Dist.] 1989, *writ denied* ) (finding that a person is relieved of his fiduciary obligations upon repudiation of the fiduciary or confidential relationship).

■ On March 24, 1992, Whidbee's discovery that MacKeen had recalculated NFL's reserves in the Heart/Cancer Block and had purchased large amounts of stock in Westbridge Capital ended MacKeen's confidential relationship with UTAIC. This discovery destroyed whatever trust and confidence had developed between UTAIC and MacKeen over the years. Both Morgan and Whidbee testified MacKeen's betrayal shocked and infuriated them and nearly caused his immediate termination. The law in Texas requires the parties to show that they were justified in relying on an alleged fiduciary. *Thompson v. Vinson & Elkins,* 859 S.W.2d at 624; *Marshall v. Quinn–L Equities, Inc.,* 704 F.Supp. 1384, 1396 (N.D.Texas 1988); *Blue Bell, Inc. v. Peat, Marwick, Mitchell, & Co.,* 715 S.W.2d 408, 416 (Tex.App.—Dallas, 1986, *writ ref'd n.r.e.*). At trial, UTAIC tendered no evidence justifying the continued employment of

MacKeen, much less the reliance on him to act in UTAIC's best interests.[15]

Secondly, the conduct of Morgan and Whidbee terminated and made a mockery of their previous confidential relationship with MacKeen. They continued to employ MacKeen and "string him along" because he was critical to the sale of UTAIC to UCT; a sale that meant tremendous profits for Morgan and Whidbee. Because of their greed, they did not express to MacKeen their disapproval of his betrayal and falsely encouraged him to become president of UTAIC. These actions belie the fiduciary relationship; they do not indicate a repose of confidence between the parties but a mutual willingness to deceive.

For the above-described reasons, the Court dismisses UTAIC's claims for breach of fiduciary duty with respect to the American Integrity transaction. MacKeen evaluated that block of business in May of 1992, approximately two months after the termination of his confidential relationship with UTAIC.[16]

## * Constructive Fraud and Violation of Duty of Good Faith and Fair Dealing

■ UTAIC has brought claims against MacKeen for constructive fraud and violation of his duty of good faith and fair dealing. The Court's finding of a breach of fiduciary or confidential duties eliminates the need to separately consider these claims. In Texas, the breach of a fiduciary or confidential relationship is virtually the same tort as constructive fraud. *See Stephanz v. Laird,* 846 S.W.2d 895, 903 (Tex.App.—Houston [1st Dist.] 1988, *no writ* ); *Thompson v. Vinson & Elkins,* 859 S.W.2d at 621. In addition, "the duty of good faith and fair dealing merely requires the parties to 'deal fairly' with one another and does not encompass the often more onerous burden that requires a party to place the interest of the other party

---

15. Whidbee may have foolishly believed his false encouragement of MacKeen to seek the presidency of UTAIC served to recapture MacKeen's loyalties. Mere subjective trust, however, is not enough to create a fiduciary relationship. *Blue Bell,* 715 S.W.2d at 416; *Thigpen,* 363 S.W.2d at 253.

16. The Court does not, of course, condone MacKeen's activities with respect to the American Integrity transaction. If MacKeen had been serving as UTA's fiduciary during that transaction, his misrepresentation to UTA to secure the deal for NFL would have flagrantly violated his fiduciary duties and his professional responsibilities.

before his own, often attributed to a fiduciary duty." *Crim Truck & Tractor v. Navistar Intern.*, 823 S.W.2d at 591. Hence, because MacKeen violated a fiduciary or confidential duty by recalculating the reserves in the Heart/Cancer Block for NFL, it is implicit that he also committed constructive fraud and violated his duty of good faith and fair dealing.[17]

## * Fraud

■ Having found that MacKeen violated his fiduciary duties to UTAIC, the Court will now briefly consider whether his actions amounted to fraud. In Texas, the elements of common law fraud are: (1) that a material representation was made, (2) that it was false, (3) that the speaker knew it was false when made or that the speaker made it recklessly without any knowledge of the truth and as a positive assertion, (4) that he made it with the intention that it be acted upon by the other party, (5) that the party acted in reliance upon it, and (6) that the party thereby suffered injury. *Eagle Properties, Ltd. v. Scharbauer*, 807 S.W.2d 714, 723 (Tex.1990).

■ Although MacKeen violated his fiduciary or confidential duties during UTAIC's negotiations for the Heart/Cancer Block, the Court cannot find his actions in that context amounted to fraud. The plaintiff proffered no evidence that MacKeen made a false representation regarding the Heart/Cancer Block transaction. On the other hand, in the American Integrity transaction, MacKeen intentionally misrepresented the real value of the medicare supplement block of business to UTAIC. To bring a successful fraud claim, however, a plaintiff must specifically prove his or her reliance on the defendant's misrepresentation was actual and justifiable.

■ Proving justifiable reliance differs from proving reasonable reliance; the former merely requires the plaintiff to show that it was conceivable—given his "individual characteristics, abilities, and appreciation of facts and circumstances at or before the time of the alleged fraud"—that he actually relied on the defendant's misrepresentation. *Harralson v. E.F. Hutton Group, Inc.*, 919 F.2d 1014, 1026 (5th Cir.1990); *Beijing Metals & Minerals v. American Business Ctr.*, 993 F.2d 1178, 1184 (5th Cir.1993). In *Lone Star Machinery Corp. v. Frankel*, the purchaser of a house asserted fraud by claiming reliance on a misrepresentation of the house's square footage in the seller's "listing sheet." Because the plaintiff had some expertise in homebuilding and was on constructive notice—having examined the house—that the square footage was misrepresented in the listing sheet, the Court found he could not have justifiably relied on the sheet.[18] *Lone Star Machinery Corp. v. Frankel*, 564 S.W.2d 135, 137–138 (Tex.Civ.App.—Beaumont 1978, *no writ*); *see also Koral Industries v. Security–Connecticut Life Ins. Co.*, 802 S.W.2d 650, 651 (Tex.1990) (holding that a person injured by fraudulent misrepresentations need not exercise diligence to suspect and discover the falsity of such statements, but he may not have an actionable cause if he

17. The Court recognizes, however, that a finding of breach of the duty of good faith and fair dealing alone, without finding a breach of fiduciary duty, is sufficient to impose liability on MacKeen under Texas tort law. *See Crim Truck & Tractor v. Navistar Intern.*, 823 S.W.2d at 594 (citing *Aranda v. Insurance Co. of N. Am.*, 748 S.W.2d 210, 212–213 (Tex.1988) and *Arnold v. National County Mut. Fire Ins. Co.*, 725 S.W.2d 165, 167 (Tex.1987)). Regardless, the Court does not conclude MacKeen breached this duty with respect to the American Integrity transaction. Texas law has consistently required the showing of a "special relationship" between the parties to recover for the tortious breach of a duty of good faith and fair dealing. *FDIC v. Coleman*, 795 S.W.2d 706, 708 (Tex.1990) (declaring that a duty of good faith and fair dealing

"is not imposed in every contract but only in special relationships marked by shared trust or an imbalance in bargaining power."); *Federal Express Corp. v. Dutschmann*, 846 S.W.2d 282, 284, n. 1 (Tex.1990). Again, any shared trust or "special relationship" that existed between MacKeen and UTA was lost on March 24, 1992.

18. In *Harralson*, the Fifth Circuit implied that Texas courts, like New York Courts, are not inclined " 'to entertain claims of justifiable reliance' when [a] sophisticated plaintiff has access to information that would reveal fraud at a time when harm could be averted." *Harralson*, 919 F.2d at 1026 (citing *Grumman Allied Industries, Inc. v. Rohr Industries, Inc.* 748 F.2d 729, 737 (2d Cir.1984)).

possessed knowledge or suspicion of their falsity).

Similarly, Whidbee had some expertise in evaluating books of business and drafting UTAIC's offers to purchase them. Furthermore, at the time of their visit to American Integrity, Whidbee knew MacKeen had deceived UTAIC for his personal benefit and MacKeen had shown no contrition for his actions. Despite these facts and circumstances, Whidbee purportedly relied on MacKeen's statement that the book of business was worthless and summarily disregarded it without questioning his analysis or rationale. The Court rejects this allegation and finds that UTAIC failed to show, by a preponderance of the evidence, a justifiable reliance on MacKeen's evaluation of the American Integrity transaction. Accordingly, the Court finds no commission of fraud with respect to that transaction.

**\* Tortious Interference**

 UTAIC also avers MacKeen tortiously interfered with its prospective business and contractual relations concerning the acquisition of the Heart/Cancer Block from NFL and the medicare supplement block from American Integrity. Texas courts have long recognized a cause of action for tortious interference with prospective business or contractual relations where: (1) there was a reasonable probability of entering into a contract or business relationship; (2) the defendant acted maliciously by intentionally preventing the relationship from occurring, with the purpose of harming the plaintiff; (3) the defendant was not privileged or justified; and (4) actual harm or damages resulted. *American Medical International, Inc. v. Giurintano,* 821 S.W.2d 331 (Tex.App.—Houston [14th Dist.] 1991, *no writ* ); *Exxon Corporation v. Allsup,* 808 S.W.2d 648 (Tex. App.—Corpus Christi 1991, *writ den'd* ); *Gillum v. Republic Heal Corp.,* 778 S.W.2d 558 (Tex.App.—Dallas 1989, *no writ* ).

 To prove tortious interference, UTAIC must establish that there was a "reasonable probability" that it would have purchased the Heart/Cancer Block were it not for MacKeen's re-calculation of the reserves on behalf of NFL. In other words, UTAIC must show that negotiations for the

Heart/Cancer Block were under way and appeared likely to succeed or reasonably certain to result in a contract advantageous to the company. *Duckworth v. Michael L. Field & Co.,* 516 F.2d 952, 955 (5th Cir.1975). The defendants argue that, regardless of MacKeen's work for NFL, UTAIC would not have purchased the Heart/Cancer Block.

After reviewing the sequence of offers and counteroffer between Whidbee and Thigpen, it would be difficult to presume the negotiations for the Heart/Cancer Block were likely to succeed. On August 30, 1991, after visiting NFL and conducting due diligence with MacKeen, Whidbee initially offered Thigpen $13 million for the Heart/Cancer Block. Thigpen tacitly rejected this offer and three months of silence ensued. On December 5, Thigpen finally broke the silence and visited UTAIC in an attempt to revive negotiations. Whidbee then made a second offer of approximately $10 million to Thigpen on January 22. Whidbee claimed the purchase price had been tax-effected, thereby explaining the $3 million reduction from his offer the preceding August. Thigpen was "shocked" by this offer and called John Scott, who was brokering the deal, to express his disappointment. Thigpen also expressed his disappointment to Whidbee. In a letter dated January 31, Thigpen told Whidbee UTAIC's offer had improperly structured the deal so that NFL would have to pay double taxes. The same letter offered to sell the block at $14.2 million. On February 11, Whidbee counteroffered at $11 million. According to Scott, Thigpen called him after this counteroffer and told him the deal was dead. Thigpen never responded to Whidbee's $11 million counteroffer. He testified, however, that NFL would have sold the block to UTAIC at $14.2 million at any time during the first quarter of 1992. David Huff, UTAIC's expert, attested Thigpen's $14.2 million offer was reasonable and could not explain why Whidbee refused to accept it. In addition, neither Huff nor Whidbee could explain why Whidbee dramatically reduced UTAIC's January and February offers.

To find reasonable probability, the Court would also have to infer that UTAIC and NFL would have compromised on certain

provisions in the contract which had created a rift in the negotiations. One such provision, insisted upon by NFL, allowed John Locke, an independent agent and competitor of Morgan, to continue managing the 150,000 individual policies in the Heart/Cancer Block. Morgan was vehemently opposed to this provision. His desire to purchase the block was based, in large part, on his potential management of these policies. NFL also inserted a condition that would allow it to continue administrating the Heart/Cancer block for at least six months after the closing date of the acquisition. Although Whidbee's February 11 letter of intent evidences some willingness to compromise on this provision, it adds several additional conditions that may not have been acceptable to NFL.

 Whidbee testified UTAIC continued to be interested in the Heart/Cancer Block after Thigpen's rejection of the February 11 offer. Even so, after February 18, Whidbee made no attempt to contact Thigpen and recharge the negotiations.[19] In Texas, tortious interference may occur even where the parties have suspended negotiations for several months. *Duckworth,* 516 F.2d at 957. In the instant case, however, communications between the parties ceased and there was no indication that the negotiations would continue in the future.

In addition to the impasse in negotiations, other circumstances suggest UTAIC would not have acquired the Heart/Cancer Block. To begin with, the Heart/Cancer Block would have been a huge acquisition for UTAIC. As part of Project Apple, Texas Commerce Bank performed several appraisals of UTAIC and, as of November 20, 1991, they evaluated the company's worth at $18–$22 million.

It is therefore uncertain, given this appraisal and the plan to sell UTAIC, that Whidbee and Morgan would be willing to go forth with a $14 million acquisition in February of 1992. At approximately seventy percent of UTAIC's net value, it would have been the largest acquisition in the company's history. Indeed, UTAIC's boldest offer ($13 million) occurred in August of 1991, before Texas Commerce's humbling appraisal. Though Whidbee ostensibly reduced UTAIC's January 1992 offer by $3 million for tax reasons, Texas Commerce's appraisal may have also induced that reduction. Something daunted UTAIC's pursuit of the Heart/Cancer Block in January of 1992 and certainly the enormity of the acquisition and the risks involved, especially its potential to hinder the sale of UTAIC, may have caused Whidbee to back off the deal.[20]

Also compelling is the fact that Morgan and Whidbee were aware of the February 28 regulatory filing deadline. Both men testified they knew NFL had to relieve its regulatory pressure by either selling the Heart/Cancer Block or otherwise increasing its capital and surplus prior to February 28, 1992.[21] They also testified Morgan was prepared to offer up to $18 million for the block. It is therefore puzzling that they made such a paltry offer on February 11 ($3.2 million less than NFL's January 31 offer) and permitted the regulatory period to lapse without increasing their offer or accepting NFL's January 31 offer. On February 18, UTAIC's $11 million offer expired and, at that point, Whidbee knew NFL had less than two weeks to either sell the Heart/Cancer Block or find a way to reduce reserves without selling the block.[22] He knew that if UTAIC was going

**19.** Whidbee and Thigpen spoke about the Heart/Cancer Block on February 18 when Thigpen called to confirm his rejection of the deal.

**20.** At trial, Whidbee failed to fully explain the reasons behind the $3 million reduction in UTA's January offer. Furthermore, UTA's expert could not rationalize Whidbee's reduced offers. It thus appears other factors, besides tax affectation, prompted Whidbee to back off his initial offer of $13 million.

**21.** Morgan went so far as to check with the Department of Insurance for the State of Delaware to confirm this fact.

**22.** In January of 1992, Whidbee was wary of a rumor that NFL had reduced its reserves by $2.5 million. Similarly, he must have suspected that during February, immediately prior to the regulatory deadline, NFL was making concerted efforts to reduce its reserves. Any such reductions could ruin the potential windfall of the acquisition. It would have therefore behooved UTA to purchase the Heart/Cancer Block quickly, before NFL actually succeeded in reducing its reserves.

to acquire the block at a favorable price, it would have to reach an agreement before the 28th of February, before the disappearance of NFL's motivation to sell the block. Inexplicably, he stood idle, letting February 28 pass and, along with it, NFL's motivation to sell the Heart/Cancer Block, or at least the need to sell it out of desperation at a bargain price.[23] Hence, it appears Whidbee and Morgan intended $11 million to be their final offer and that amount was clearly unacceptable to NFL.

It should also be noted that information concerning NFL's 7.8 million reduction was accessible to Morgan and Whidbee as of March 2. At that time, the Department of Insurance for the State of Delaware had the relevant documents (bearing MacKeen's signature) on file and available upon request. In fact, Morgan had contacted the Delaware Department of Insurance in January to verify that NFL had done nothing to reduce its reserves. Seemingly, if Morgan and Whidbee were still interested after the February 28 deadline, they would have again checked with the Department during the first week of March to determine whether or how much NFL had reduced its reserves in satisfaction of the Department's demands. Nevertheless, they did not learn of the reserve reduction until MacKeen told Whidbee on March 24.

As a final point, the Court notes that all three of UTAIC's offers were preliminary offers (or letters of intent) that included escape clauses. These clauses granted each party an additional month after NFL's acceptance to cancel the deal.[24] They decreased the probability of consummation and added an additional inference to an already towering stack.

For the reasons discussed above, the Court cannot conclude, from a preponderance of the evidence, that UTAIC would have acquired the Heart/Cancer Block but for the actions of MacKeen. UTAIC failed to discharge its burden of showing a reasonable probability that a contract would have been formed.[25] Proof has been defined as "[t]he testimony of two credible witnesses as opposed to that of one." Ambrose Bierce, *The Devil's Dictionary* 268–269 (1911). It is therefore difficult, if not impossible, to carry a burden of proof with no credible witnesses. Lastly, because the American Integrity deal was in its primordial stages when MacKeen "interfered" with it, there is clearly no actionable cause for tortious interference in that transaction. Though the actions of MacKeen are reprehensible, they did not amount to tortious interference under Texas law.

## * Corporate Opportunity Doctrine and Constructive Trusts

 While the Court cannot find that MacKeen tortiously interfered with the UTAIC's business or contractual relations, it does find, by a preponderance of the evidence, that MacKeen diverted or usurped UTAIC's corporate opportunity when he recalculated the reserves for NFL without notifying UTAIC. The corporate opportunity doctrine divests a corporate fiduciary of all interests acquired in violation of his or her fiduciary relationship and places them in a constructive trust on behalf of the corporation. *Dyer v. Shafer*, 779 S.W.2d 474, 476 (Tex.App.—El Paso 1989, *writ denied*); *Matter of Safety Int'l., Inc.*, 775 F.2d 660, 662 (5th Cir.1985). Texas courts have traditionally applied this doctrine where the defendant exploits his position as a fiduciary to capitalize on an investment opportunity without disclosure to the corporation. Though the doctrine most frequently applies to corporate officers and directors, it can be used to disgorge interests

---

**23.** It matters not that MacKeen was the reason NFL was able to avoid the sale of the Heart/Cancer Block. What matters is the state of mind of Whidbee and Morgan. They knew the critical period to sell the block was prior to February 28 and they stood on a feeble $11 million offer while that period expired. It is indeed a nagging question why they did not increase their offer.

**24.** Interestingly, Thigpen's offer of January 31 did not include an escape clause.

**25.** In arguing "reasonable probability" Plaintiff proffered only two pieces of evidence: 1) Morgan and Whidbee's testimony that Morgan was prepared to pay up to $18 million for the Heart/Cancer Block; and 2) John Scott's notes which state, "David loves this," in reference to the Heart/Cancer Block. Without question, this evidence cannot vitiate the numerous factors indicating the deal would not have been consummated.

improperly or surreptitiously acquired by any fiduciary of the corporation. *Thywissen v. Cron,* 781 S.W.2d at 686; *International Bankers' Life Ins. Co. v. Holloway,* 368 S.W.2d 567, 576–577 (Tex.1963).

 Having established that MacKeen breached his confidential duties in the Heart/Cancer Block transaction, especially his duty to disclose his conflict of interests, the Court will now determine whether this conduct usurped or diverted UTAIC's opportunity to purchase that block and whether a constructive trust should be imposed upon him to avoid any unjust enrichment and to restore any lost interests to the corporation. Unlike tortious interference with business or contractual relations, the corporate opportunity doctrine does not require the plaintiff to show a reasonable probability that it would have capitalized on the lost investment opportunity. In *Imperial Group (Texas), Inc. v. Scholnick,* the defendant breached his fiduciary duties by failing to disclose the availability of certain tracts of land to the corporation. *Imperial Group (Texas), Inc. v. Scholnick,* 709 S.W.2d 358 (Tex.App.—Tyler 1986, *writ ref'd n.r.e.*). The appellate court in *Scholnick* applied the corporate opportunity doctrine, imposed a constructive trust, and awarded the plaintiff corporation damages despite the jury's determination that the corporation would not have acquired the tracts. The court reasoned,

> The corporate opportunity doctrine requires full disclosure ... [t]he decision to accept or reject the opportunity to purchase [the tracts] was Imperial's alone, acting upon full and complete knowledge of the material facts surrounding the opportunity ... [t]o permit an after-the-fact determination as to whether [the corporation] would have purchased [the tracts] under the facts before us would abrogate the full disclosure rule.

*Id.* at 363. Furthermore, as long as the corporation "has a legitimate interest or expectancy in, and the financial resources to take advantage of, a particular business opportunity," the corporate opportunity doc-

trine will apply. *Matter of Safety Int'l, Inc.,* 775 F.2d at 662; *Dyer,* 779 S.W.2d at 477.

In this case, MacKeen's recalculation of the reserves in the Heart/Cancer Block on behalf of NFL without disclosure to UTAIC destroyed an opportunity for UTAIC to acquire the block. Whidbee testified UTAIC would have accepted Thigpen's January 31st offer of $14.2 million had he known MacKeen was recalculating the reserves. In retrospect, whether UTAIC would have purchased the block at $14.2 million is immaterial; what matters is that MacKeen deprived UTAIC of "full and complete knowledge of the material facts surrounding the opportunity." In addition, UTAIC had both a legitimate interest in the Heart/Cancer Block and the financial capacity to purchase it.[26] Thus, UTAIC's failure to convince the Court that it would have purchased the block does not preclude the application of the corporate opportunity doctrine.

 As mentioned above, the corporate opportunity doctrine is usually implemented when a fiduciary deprives the corporation of an opportunity to acquire assets by concealing their availability and purchasing them himself; often referred to as self-dealing. Where self-dealing occurs, the courts simply determine the value of the assets acquired by the fiduciary and award the corporation damages in that amount. The case at bar presents a different scenario; although MacKeen deprived UTAIC of the opportunity to purchase the Heart/Cancer Block, he did not do so by personally purchasing the block. Nonetheless, MacKeen indirectly benefitted himself by depriving UTAIC of its investment opportunity. His actions also benefitted NFL by allowing it to retain the Heart/Cancer Block and avoid a disadvantageous sale to UTAIC. Texas courts have held that the corporate opportunity doctrine can apply when the corporate fiduciary breaches his duties in order to benefit a third party. *See Interfirst Bank Dallas v. Risser,* 739 S.W.2d 882, 899 (Tex.App.—Texarkana 1987, *no writ* ) (determining that any conduct by a trustee which violates his fiduciary duty

---

**26.** Again, it is clear that the Heart/Cancer Block would have been UTAIC's largest acquisition. The plaintiff introduced enough evidence, however, to show it was capable of purchasing the block.

"by taking advantage of [his] position as trustee to benefit [himself] *or some third person which [he] desires to be benefitted,* can constitute self-dealing," thereby permitting a remedy under the corporate opportunity doctrine) (emphasis added); *Mims v. Beall,* 810 S.W.2d 876 (Tex.App.—Texarkana 1991, *no writ*) (permitting a non-breaching fiduciary to recoup, via a constructive trust, royalties improperly diverted to son of breaching fiduciary); *Gearhart Indus., Inc. v. Smith Int'l, Inc.,* 741 F.2d 707, 719 (5th Cir.1984) (applying Texas law and asserting that a corporate fiduciary may breach his fiduciary duty if he allows his personal interests to prevail over the interests of the corporation by transacting business with a second corporation with which he is significantly financially associated).

■ To assess the damages resulting from MacKeen's deprivation of UTAIC's opportunity to purchase the Heart/Cancer Block, the Court will determine the value of the lost opportunity to UTAIC and any benefits MacKeen personally acquired as a result of the deprivation. Admittedly, the value of the lost opportunity in this case is somewhat abstract; it is not easily appraisable like a tract of land that a fiduciary usurps from a corporation for personal profit. The Court finds that by applying the "layman's scale" (used to calculate brokers' commissions) to the purchase price of the Heart/Cancer Block, it can ascertain a reasonable value for the opportunity lost to UTAIC and gained (or retained) by NFL as a result of MacKeen's recalculation of the reserves. This scale represents the value of the broker's services in negotiating and consummating a transaction. Because MacKeen deprived UTAIC of the opportunity to negotiate and consummate the transaction, applying the scale renders a fair estimation of the value of that opportunity. Using the scale and relying on a preponderance of the evidence presented at trial, the Court concludes that the opportunity to negotiate and purchase the

Heart/Cancer Block of business was worth $240,000 to UTAIC. Therefore, under the corporate opportunity doctrine, the Court will impose a constructive trust upon MacKeen & Bailey, Inc. in this amount.

MacKeen's breach of fiduciary duties also enabled him to generate profits for himself. MacKeen indirectly benefitted from his diversion of UTAIC's investment opportunity to NFL. Due to his furtive recalculation of the reserves in the Heart/Cancer Block, NFL was able to avoid the sale of the block and convert approximately $7.8 million into capital and surplus. As a result, the stock value of NFL's parent corporation, Westbridge Capital, escalated. MacKeen purchased 46,300 shares of Westbridge stock soon after his recalculation. He purchased shares at an average price of $3.50 per share and, as of the date of this opinion, Westbridge's stock has risen to $8.25 per share. Therefore, the net gain in stock value equals $219,925.

MacKeen's realization of $225,994 in stock earnings does not, in itself, represent an opportunity he usurped from UTAIC. It is, however, directly attributable to his usurpation of UTAIC's opportunity to purchase the Heart/Cancer Block. Moreover, even if the corporate opportunity doctrine does not apply to MacKeen's stock scheme, Texas courts have frequently imposed a constructive trust as an equitable remedy whenever there is unjust enrichment resulting from a breach of fiduciary or confidential duties. *Weaver v. Stewart,* 825 S.W.2d 183 (Tex.App.—Houston [14th Dist.] 1992, *writ denied*); *Mims v. Beall,* 810 S.W.2d 876, 881 (Tex.App.—Texarkana 1991, *no writ*); *Hughes v. Houston Northwest Medical Center, Inc.,* 680 S.W.2d 838, 843 (Tex.App.—Houston [1st Dist.] 1984, *ref. n.r.e.*), *cert. denied* 474 U.S. 1020, 106 S.Ct. 571, 88 L.Ed.2d 555. Therefore, the Court will impose a constructive trust on MacKeen personally in the amount of $225,944.[27] In total, the actual damages caused

**27.** The Court should also note that MacKeen's recalculation of the reserves helped MacKeen & Bailey, Inc. to acquire NFL as its most lucrative client. UTAIC introduced no evidence, however, to show the amount of fees NFL has paid MacKeen & Bailey, Inc. since the recalculation of the reserves. Also, it is conceivable that MacKeen & Bailey may have increased its work for NFL notwithstanding MacKeen's recalculation of the reserves. Any assessment of damages on this basis would therefore be too speculative.

by MacKeen's breach of fiduciary duty in the Heart Cancer transaction equals $465,944.

The Court will not apply the corporate opportunity doctrine or a constructive trust to recover any benefits or profits resulting from MacKeen's misconduct in the American Integrity transaction. These remedies are only available where there has been a breach of a fiduciary or confidential relationship and, as discussed above, MacKeen and UTAIC had shattered their confidential relationship prior to that transaction. As *Vaquero Petroleum Co. v. Simmons* proclaims,

> [e]ach person must exercise due care for the protection of his business interests, and the fact that a confidential relationship existed at one time is not sufficient to impose a constructive trust on properties acquired by confidant after the confidential relationship terminated, when the confider had the means to adequately protect his own interest in the subject properties prior to their acquisition by the confidant, and did not do so.

*Vaquero Petroleum Co. v. Simmons*, 636 S.W.2d 762, 767 (Tex.App.—Corpus Christi 1982, *no writ*). By continuing to employ MacKeen after his flagrant infidelity in the Heart/Cancer Block transaction, UTAIC did not exercise due care in protecting its interests in potential acquisitions such as the American Integrity block of business. It could have protected its interest in such acquisitions by simply firing MacKeen and hiring an ethical and trustworthy actuary. As in *Vaquero*, the confidential relationship had terminated prior to the alleged usurpation or diversion of the property (i.e., the American Integrity block) and, consequently, the Court cannot provide a remedy.

**\* Breach of Contract Claims**

Each party in this lawsuit has alleged the other party breached the 1989 Retainer Agreement.[28] In its original complaint, UTAIC alleged MacKeen's actions related to the Heart/Cancer and American Integrity transactions constituted a breach of the Retainer Agreement; the theory being that MacKeen had breached an implied contractual duty of good faith and fair dealing. Subsequently, UTAIC realized its cause of action had tortious connotations and amended its complaint to include various tort claims. While MacKeen may have breached a covenant of good faith and fair dealing implied in the contract, this claim sounds in tort, not contract.

At common law, breach of duty of good faith and fair dealing traditionally gives rise to a tort cause of action and the right to recover actual and punitive damages. *Central Sav. & Loan v. Stemmons Northwest*, 848 S.W.2d 232, 239 (Tex.App.—Dallas 1992, *no writ*). Although the duty of good faith and fair dealing in performance of a contract can exist under the UCC[29], the allegations and trial evidence in this case have associated that duty exclusively with MacKeen's tortious conduct, i.e. his breach of fiduciary duties and professional responsibilities. Moreover, when determining whether a cause of action sounds in contract or tort, Texas courts have looked to the damages sought or nature of the plaintiff's injury. *Id.* at 238. In this case, UTAIC does not seek damages arising out of the terms or subject matter of the Retainer Agreement. *See Jim Walter Homes, Inc. v. Reed*, 711 S.W.2d 617, 618 (Tex.1986) (finding that when the injury is the economic loss to the subject of the contract alone, the action generally sounds in

---

**28.** Both sides also testified at trial that the Retainer Agreement was unconscionable. MacKeen alleged it lacked consideration while Whidbee claimed it unjustly permitted MacKeen the opportunity to exploit conflicts of interest (particularly through his management of the Incentive Blocks). The Court deems this testimony preposterous. Though the actions of the parties pursuant to the agreement may have been unconscionable, the agreement itself is not. It provides consideration for MacKeen & Bailey, exhibited by its provision for monthly retainer disbursements and for MacKeen's participation in future acquisitions by UTAIC. Defeating Whidbee's contention are the facts that he was aware of the risks of conflicting interests prior to the drafting of the agreement and that the agreement was drafted by counsel for UTAIC. Finally, because both parties are sophisticated businessmen, the Court concludes they were fully aware of the risks and ramifications of the agreement and thus their claims of unconscionability are invalid.

**29.** Tex.Bus. & Com.Code Ann. Sec. 1.203 (Vernon 1968).

contract); *Commercial Escrow v. Rockport Rebel*, 778 S.W.2d 532, 539 (Tex.App.—Corpus Christi 1989, *no writ*). Lastly, even though MacKeen may have breached his implied contractual duties of good faith and fair dealing, UTAIC appeared to consider this breach immaterial. For nine months after UTAIC discovered MacKeen's breach, it continued sending him checks pursuant to the contract. Whidbee and Morgan collected checks for approximately a year and a half after they discovered MacKeen's breach. The continuation of these disbursements ratified or affirmed the Retainer agreement until October of 1993. For the above-described reasons, the Court finds that all UTAIC's causes of action sound in tort and will not consider its claim for breach of contract.

Turning to Defendants' counterclaims, the Court should first dismiss the tort claims of fraud and breach of duty of good faith and fair dealing. One might consider the actions of Whidbee and Morgan to be as serpentine as those of MacKeen; they did not, however, amount to fraud. MacKeen failed to show any fraudulent conduct by Morgan or Whidbee (or UTAIC) or any damages resulting from such conduct. Unlike the plaintiff's claim for breach of duty of good faith and fair dealing, Defendants' claim sounds in contract law. It does not arise out of any tortious conduct of Whidbee and Morgan, but their failure to honor the Retainer Agreement. Thus, the Court deems this claim indistinguishable from Defendants' breach of contract claim.

 Defendants allege UTAIC breached the Retainer Agreement by terminating MacKeen's $12,500 monthly disbursements in January of 1993. Again, under the agreement, MacKeen was entitled to the monthly disbursements through December of 1998, assuming the Incentive Blocks continued to realize profits until that date. In defending this counterclaim, UTAIC asserts MacKeen repudiated the agreement by: 1) mismanaging the Incentive Blocks and 2) breaching his fiduciary duties. According to UTAIC,

MacKeen repudiation permitted it to terminate or renounce the agreement. While the first of these defenses is an obvious fabrication, the latter may provide effective grounds for UTAIC's renunciation of the Retainer Agreement and its discontinuance of the disbursements.

At trial, UTAIC asserted MacKeen mismanaged the Incentive Blocks by applying unsound actuarial principles. UTAIC theorized that the discovery of these discrepancies prompted its firing of MacKeen, it cessation of the retainer disbursements, and, accordingly, its renunciation of the Retainer Agreement. The Court assigns no credibility to this theory. For many years, Morgan and Whidbee had profited from MacKeen's "aggressive" actuarial methods and his "management" of the Incentive Blocks. Any suspicions they had about his methods were quickly forgotten when they saw his lucrative bottom lines. They never questioned the propriety of MacKeen's calculations while they were receiving their monthly checks.[30] They continued to draw their checks until it became apparent to them, after talking with their expert and their lawyers, that this activity undermined their repudiation defense. Morgan and Whidbee stopped receiving checks when, at Mr. Huff's deposition in October, they realized it would be contradictory to declare the Incentive Blocks unprofitable while receiving disbursements from them. Additional evidence showed Whidbee was able to arbitrarily charge expenses to the Incentive Blocks and thereby diminish their profitability. At one point, $125,000 was inexplicably deducted from the Incentive Blocks and listed as "profits" apparently going to Whidbee and Morgan. Because of such reductions (known and unknown) it is difficult to give an accurate assessment of the blocks' performance.

The truth be told, Morgan and Whidbee had no knowledge of the theory that MacKeen had mismanaged the Incentive Blocks (and thereby repudiated the agreement) at the time they terminated his disbursements

---

**30.** Again, the Retainer Agreement provided that annual adjustments should be made to the retainer fee payments according to profitability of the Incentive Blocks. Morgan and Whidbee did nothing to ensure the enforcement of this provision and the fee did not change one cent from May of 1989 until October of 1993.

and his employment. Those allegations are a product of litigation discovery and do not legitimate a renunciation of the Retainer Agreement. In reality, Morgan and Whidbee fired MacKeen due to his infidelities in the Heart/Cancer Block and American Integrity transactions and, more importantly, his failure to consummate the sale of UTAIC to UCT.

■ Despite the ill-contrived theory described above, MacKeen's conduct with respect to the Heart/Cancer Block and American Integrity transactions may be construed as a repudiation of the Retainer Agreement. "A repudiation is manifested by one party to the other that the first cannot or will not perform at least some of his obligations under the contract." E. Allan Farnsworth, Contracts § 8.21, at 634 (9th ed. 1982). Furthermore, "for a repudiation to have legal effect, the threatened breach must be serious ... serious enough that the injured party could treat it as total if it occurred." *Id.* In Texas, when the words or actions of a contracting party indicate that he is not going to perform his contract in the future, he has repudiated the contract. *Fowler v. R.T.C.,* 855 S.W.2d 31, 36 (Tex.App.—El Paso 1993, *no writ*); *Panasonic v. Zinn,* 903 F.2d 1039, 1042 (5th Cir.1990). In essence, the plaintiff has alleged MacKeen's double-crossing of UTAIC (in the Heart/Cancer Block and American Integrity transactions) served notice to UTAIC that he would not continue to honor his contractual duties of good faith and fair dealing and, therefore, amounted to a repudiation of the Retainer Agreement. It is UTAIC's position that after MacKeen's repudiation it exercised its right to renounce the contract and discharge its remaining obligations, particularly its obligations to pay MacKeen a monthly retainer fee. Notwithstanding the dismissal of UTAIC's breach of contract claims, the Court agrees with UTAIC's affirmative defense of breach of fiduciary duty and repudiation.

■ Breach of a confidential or fiduciary duty, if proved, can justify the rescission of a contract. Rescission is an equitable remedy available when a legally valid contract is "marred by fraud, mistake, or for some other reason must be set aside to avoid unjust enrichment." *Lowrey v. The University of Texas Medical Branch at Galveston,* 837 S.W.2d 171, 174 (Tex.App.—1992 El Paso, *writ ref'd*); *see also Cambridge Oil Company v. Huggins,* 765 S.W.2d 540, 541 (Tex.App.—Corpus Christi 1989, *no writ*) (suggesting that rescission remedies are available where the evidence supports a non-fraud tort); *Chien v. Chen,* 759 S.W.2d 484, 494 n. 6 (Tex.App.—Austin 1988) (finding that equitable remedies such as rescission may be awarded for breach of a fiduciary relationship). *First City National Bank & Trust Co. v. Miller Bristow & Brown,* No. C14–89–00636–CV, 1990 WL 71333, at *2 (Tex.App.—Houston [14th Dist.], May 31, 1990, *n.w.h.*) (acknowledging breach of fiduciary duty as an affirmative defense to cause of action for recovery of attorney's fees); *First Interstate Bank of Oklahoma v. Service Stores of America, Inc.,* 128 F.R.D. 679, 680 (W.D.Okla.1989) (recognizing breach of fiduciary duty as a meritorious affirmative defense which may "defeat, diminish, or offset plaintiff's recovery."); *Thornhill v. Donnkenny,* 823 F.2d 782, 786 (4th Cir.1987) (declaring that defense of breach of fiduciary duty is a valid affirmative defense against a claim for breach of a valid employment contract). Although the above-cited cases permit avoidance or rescission of a contract due to breaches of fiduciary duties, the Court sees no reason why the same breaches should not constitute repudiation and, consequently, permit the renunciation of a contract. The Court recognizes that the texts and cases sometimes use "rescission" and "renunciation" interchangeably. In this case, however, the Court uses the terms "renounce" and "renunciation" to denote a discharge of all remaining obligations under the contract without attempting to return the parties to their pre-contract positions. In other words if the contract is renounced, the parties may retain any benefits they received until the date of renunciation but may discharge all of their remaining obligations. In contrast, the Court interprets rescission and avoidance as meaning a return to the parties' pre-contractual positions.

Indeed, rescission or avoidance would be inappropriate under the circumstances of the

case at bar; to return the parties to their positions prior to the agreement would be impractical. Before the Retainer Agreement, Morgan, Whidbee, and MacKeen operated under a ⅓ profit-sharing arrangement and, in light of the events occurring over the past two years, it would be absurd to re-establish that relationship.

Unlike rescission and avoidance, renunciation (following a repudiation) appropriately resolves the dispute in this case. It would be most equitable to renounce the agreement which, although valid, must be set aside to avoid any unjust enrichment. *Compare Lowrey,* 837 S.W.2d at 174; *see Wakefield v. Bevly,* 704 S.W.2d 339, 347 (Tex.App.—Corpus Christi 1985, *no writ* ) (awarding damages when defendant obtained secret profits by breaching his fiduciary duty and his employment contract). This Court will not permit MacKeen to continue receiving checks from UTAIC when he shamelessly breached his fiduciary duties to that company. However, the parties should be permitted to retain whatever benefits they received under the agreement until the date of renunciation.

■ Despite UTAIC's assertions, the company did not renounce the Retainer Agreement in December of 1992 when it ceased paying MacKeen's retainer fees. Whidbee and Morgan continued to ratify the agreement by receiving their monthly disbursements until October of 1993. A party seeking avoidance for a breach of fiduciary duty cannot disaffirm a part of the contract that is particularly disadvantageous to himself while affirming those portions that benefit him. *See Restatement (Second) of Contracts* §§ 376, 383, and 384; *Merrill Lynch v. Perelle,* 356 Pa.Super 165, 180, 514 A.2d 552, 559 (Pa.Super.1986). Therefore, by receiving their monthly retainer disbursements, Morgan and Whidbee ratified the entire agreement, including the provision entitling MacKeen to receive the disbursements. The Court therefore concludes that the Retainer Agreement was still in effect between the months of January and October of 1993. UTAIC's failure to pay MacKeen his $12,500 monthly fee during that ten month period breached the agreement and he is entitled to damages.

In October of 1993, when Morgan and Whidbee terminated all disbursements pursuant to the Retainer Agreement, including their own, they effectively renounced the agreement. Regardless of their previous ratifications, the same grounds for renunciation—MacKeen's conduct in the Heart/Cancer Block and American Integrity transactions—existed in October of 1993. Therefore, UTAIC did not waive its right to renounce the Retainer Agreement at that time. *See Wamsley v. Champlin Refining and Chemicals, Inc.,* 11 F.3d 534, 538 (5th Cir. 1993) (construing Texas law and determining that the doctrine of contractual ratification permits a party to renounce or avoid performance of a contract if the same grounds for renunciation exist after the party has ratified the contract). In conclusion, as of October of 1993, the Retainer Agreement ceased to exist and MacKeen cannot recover any retainer fee disbursements accruing after that date.

As a final point, the Court is persuaded by a preponderance of the evidence that Morgan, Whidbee, and MacKeen have completely plundered the Incentive Blocks. These blocks no longer contain an adequate "surplus" to support the disbursements. It appears that only rate increases will sustain the blocks in the future. Therefore, the Retainer Agreement, premised on the profitability of the blocks, has expired on its own terms.

### Conclusion/Damages

Based on the findings above, the Court awards damages to UTAIC for MacKeen's breach of fiduciary duty and, consequently, his usurpation of a corporate opportunity in the Heart/Cancer Block transaction. Although the Court cannot find, by a preponderance of the evidence, that UTAIC would have purchased the Heart/Cancer Block but for MacKeen's conduct, it remains certain that his recalculation of the reserves eliminated any opportunity UTAIC had to purchase the block. As discussed above, the Court finds, from a preponderance of the evidence, that this opportunity was worth $240,000 to UTAIC and holds Duncan MacKeen and MacKeen & Bailey, Inc. jointly and severally liable for that amount. Additionally, the Court awards UTAIC $219,925 (46,300

* $8.25–46,300 * $3.50), payable by Duncan MacKeen personally, for the stock benefits he received as a result of his usurpation of the Heart/Cancer Block. The Court also assesses $250,000 in exemplary damages against Duncan MacKeen and MacKeen & Bailey, Inc. jointly and severally for MacKeen's opprobrious conduct.[31]

The undersigned also finds that UTAIC breached the Retainer Agreement by not paying MacKeen his $12,500 monthly retainer fee from January through October of 1993. Because Morgan and Whidbee continued to receive their fees until October, the Retainer Agreement was not effectively repudiated until that time. Accordingly, the Court awards MacKeen & Bailey, Inc. $125,000 plus accrued interest and holds UTAIC, UTA, Inc., and the Whidbee Corporation jointly and severally liable for that amount.

For reasons evident from the discussion above, the Court determines that neither party in this suit is entitled to an award of costs and attorneys fees. The Judgment will require each party to absorb its or his own costs and attorney's fees.

### FINAL JUDGMENT

BE IT REMEMBERED on this the 8th day of March 1994, the Court, having issued its Findings of Fact and Conclusions of Law in this cause, and, in accordance with the same, enters the following final judgment:

IT IS ORDERED, ADJUDGED, and DECREED that the Plaintiff United Teacher Associates Insurance Company do have and recover judgment of and against MacKeen & Hull, Inc. (formerly known as MacKeen & Bailey, Inc.) and W. Duncan MacKeen, Individually, in the amount of $240,000.00 in compensatory damages and $250,000.00 in punitive damages and that said liability is joint and several and said judgment shall bear interest at the rate of 4.22 percent per annum until paid;

In addition to the aforesaid, IT IS FURTHER ORDERED, ADJUDGED, and DECREED that the Plaintiff United Teacher Associates Insurance Company do have and recover judgment against W. Duncan MacKeen, Individually, in the amount of $219,925.00, and said judgment shall bear the rate of interest of 4.22 percent per annum until paid;

IT IS FURTHER ORDERED, ADJUDGED, and DECREED Counterclaimant/Third–Party Plaintiff MacKeen & Hull, Inc. (formerly known as MacKeen & Bailey, Inc.) do have and recover judgment of and against United Teacher Associates Insurance Company, United Teacher Associates, Inc., and The Whidbee Corporation in the total amount of $125,000.00, plus accrued interest from January 1, 1993, to October 31, 1993, of $2,244.00, and said judgment shall bear the interest at 4.22 percent per annum from November 1, 1993, until paid;

IT IS FURTHER ORDERED, ADJUDGED, and DECREED that each party herein shall bear his or its own costs and attorney's fees;

IT IS FURTHER ORDERED that all other relief requested by any party against the other is DENIED.

IT IS FINALLY ORDERED that writs of execution may issue on this judgment.

---

31. The Court should comment that it awards exemplary damages to the plaintiff with some reservations. This case presents a classic example of why exemplary damages should be awarded to the state or some other institution more deserving than the plaintiff.